*H. L. Ross* for plaintiff.

*J. W. Russell* for defendant.

---

## TERRITORY *v.* LINCOLN L. McCANDLESS

### No. 1111.

RESERVED QUESTIONS FROM CIRCUIT COURT, FIRST CIRCUIT. HON. W. H. HEEN, JUDGE.

ARGUED OCTOBER 8, 1918.        DECIDED OCTOBER 31, 1918.

COKE, C. J., KEMP AND EDINGS, JJ.

WAR—*authority of Congress to fix prices of foods.*

   Congress possesses authority under the war-power conferred by the Constitution of the United States to enact laws regulating the prices of food and other commodities which may be helpful to the nation while engaged in war.

Opinion of the Court.

SAME—*same.*

This authority to legislate is conferred upon Congress by those constitutional provisions which grant to it power to declare war, to raise and support armies, etc., and which is known as the war-power of Congress.

SAME—*states and territories.*

The foregoing power is not enjoyed by the states and territories.

STATES AND TERRITORIES—*authority to control private property and to fix prices.*

The states and territories may regulate common carriers, innkeepers, warehousemen, etc., whenever they enjoy extraordinary legal privileges or constitute a monopoly.

SAME—*same—police power.*

The police power is broad in its scope but it is subject to the just limitation that it extends only to such measures as are reasonable in their application and which tend in some appreciable degree to promote, protect or conserve the public health, morals or safety or the general welfare.

CONSTITUTIONAL LAW—*limitation upon the authority of the state to interfere with the privileges of the individual.*

It is unlawful to interfere with the privileges of the individual to seek and obtain such compensation as he can for his private property where he neither asks nor receives from the sovereign power any special right or immunity not given to or possessed by every other citizen and where he has not devoted his property to any public use so that the same becomes impressed with a public interest within the meaning of the law.

SAME—*same—territorial statutes regulating the price of food.*

A territorial statute creating a commission clothed with authority to fix the price or prices at which food or foods shall be sold within the Territory held unconstitutional.

OPINION OF THE COURT BY COKE, C. J.

The defendant, L. L. McCandless, was charged in the circuit court of the first judicial circuit with having intentionally and unlawfully sold a bag of Hawaiian grown rice of one hundred pounds weight, charging and receiving therefor more than the sum of eight dollars from the purchaser thereof in violation of the provisions of a

certain regulation of the Territory of Hawaii made and dated May 3, 1918. The case now comes to this court upon reserved questions of law from the circuit court. The reserved questions are as follows:

"1st—Are the provisions of Section 8, Act 221 of the Session Laws of 1917, in so far as they attempt to confer upon the Food Commission of the Territory, by said act created, the power and authority to fix, or control by fixing, the price or prices at which food shall be sold within the Territory, void as contrary to the provisions of Section 55 of the Organic Act extending the legislative power of the Territory 'to all rightful subjects of legislation not inconsistent with the Constitution and laws of the United States locally applicable?'

"2nd—Are the provisions of Section 8, Act 221 of the Session Laws of 1917, in so far as they attempt to confer upon the Food Commission of the Territory, by said act created, the power and authority to fix, or control by fixing, in advance, or otherwise, the price or prices at which food shall be sold within the Territory, null and void in that they are inconsistent with the laws of the United States locally applicable, undertake to penalize acts already made penal by the laws of the United States, to-wit, the Act of Congress of the United States of August 10, 1917, entitled 'An Act to provide further for the national security and defense by encouraging the production, conserving the supply and controlling the distribution of food products and fuel,' being Chapter 53 of the Statutes of the United States of America passed by the first session of the 65th Congress of 1917?

"3rd—Do the provisons of Section 8, Act 221 of the Session Laws of 1917, in so far as they attempt to confer upon the Food Commission of the Territory, by said act created, the power and authority to fix, or control by fixing, in advance, or otherwise, the price or prices at which food shall be sold within the Territory of Hawaii, abridge the privileges and (or) immunities of citizens of the United States, or deny to defendant the equal protection of the laws or deprive defendant of property without due process of law, and in this respect are they contrary to

the provisions of Articles 5 and 14 of the Amendments to the Constitution of the United States?

"4th—Does the alleged regulation of May 3rd, 1918, of the Food Commission of the Territory discriminate against growers of Hawaiian rice in favor of rice grown elsewhere than in Hawaii, or does it punish in respect to the sale of Hawaiian grown rice what is permitted as lawful in respect to the sale of foreign grown rice, and is it in these respects, or either of these respects, unequal in its operation, unreasonable, unjustly and (or) illegally discriminatory and (or) impinge the provisions of Articles 5 and 14 of the Amendments of the Constitution of the United States in respect to equal protection of the laws and deprivation of property without due process of the laws?

"5th—Are the provisions of Section 8, Act 221 of the Session Laws of 1917, illegal and void as an attempt by the Territory to exercise powers necessarily incidental to declaring war, supporting armies and maintaining a navy, the powers over and concerning which are reposed exclusively in the Congress of the United States under the provisons of Article 1, Section 8, Clauses 11, 12 and 13 thereof?

"6th—Does the information set forth facts sufficient to constitute an offense against the Territory of Hawaii?"

The reservation involves the constitutionality of section 8 of Act 221 of the Session Laws of 1917 and the regulation of May 3, 1918, passed by the territorial food commission under the powers reposed in it by that section, and to this phase of the cause we will direct our attention.

The act of the legislature of the Territory of Hawaii of the session of 1917, and known as Act 221, is entitled "An Act creating a commission to increase, conserve, regulate and control the food supplies of the Territory of Hawaii, and defining its powers and duties and making an appropriation for the purposes thereof." This act provides for the appointment of a commission and defines its general duties as follows:

"Section 4.  General duties.  During the period that the

United States shall be at war and for such further period as shall be reasonably necessary, it shall be the general duty of the commission to encourage and in every practicable manner to seek to increase the production of food within the Territory both for shipment to the mainland and so that there may be produced within the Territory, as nearly as may be, sufficient food to supply all local needs; also in every practicable manner to conserve and prevent the waste of food whether direct or indirect, including the improper or uneconomic use thereof."

Section 5 of the act defines the general powers of the commission and section 8, which is the basis of this controversy, is as follows:

"Section 8. Regulation of prices. Whenever in the opinion of the commission the circumstances justify and the public interest requires such action, it shall investigate, and, in so far as it is not prevented by the constitution or laws of the United States, may by regulation fix or control the price or prices at which any food or foods shall be sold within the Territory so that the same shall be reasonable, and to prevent unreasonable discrimination between localities, or between users or consumers under substantially similar conditions."

It should be stated at the outset that there is no disposition by the defendant to question the authority of Congress to enact, under the war-power conferred by the Constitution of the United States, plenary laws regulating the prices of foods and other commodities which may be helpful to the nation while engaged in war. This authority to legislate is conferred upon Congress by those constitutional provisions which grant to it power to declare war, to raise and support armies, etc., and which is known as the war-power of Congress. In the exercise of this authority Congress, shortly after the commencement of war between the United States and the Imperial German government, in April, 1917, passed what is known as the Federal Food Control Bill, which authorized the Presi-

dent of the United States by reason of the existence of a state of war and for the national security and defense, the successful prosecution of the war and the support and maintenance of the army and navy, to exercise the power of regulation and control over foods, fuel and numerous other commodities mentioned and to fix the prices of wheat and of coal and coke, and whenever it is deemed essential to carry into effect the provisions of the act the President might by proclamation require licenses to be obtained for the importation, manufacture, storage and distribution of necessities. By virtue of this authority the President did by proclamation dated the 8th day of October, 1917, require all persons engaged in distributing, buying and selling rice, rice flour and many other commodities mentioned in the proclamation to obtain licenses therefor, and profiteering in any necessity (rice, etc.) is made unlawful and punishable.

It cannot be questioned that by reason of the existing state of war and under its war-power Congress had the authority to pass the Federal Food Control Act and therein to authorize the President to fix the prices of certain commodities and to make unreasonable profiteering in others a crime. It however must be constantly borne in mind that this was a war measure pure and simple, enacted exclusively under the authority of the war-power of Congress. The authority to enact such a statute is incident to the clauses of the Constitution giving Congress power "to declare war * * *, to raise and support armies * * *." Art. I, Sec. 8. Under the same grant of power Congress passed the Selective Draft Act, which was recently sustained by the Federal Supreme Court (245 U. S. 366), and many other statutes. The police power of the Federal government, as well as of the various states and territories, can be exercised in either peace or war times, and is a power of government entirely separate and dis-

tinct from the war-power of Congress reposed in it by the Federal Constitution. The latter power is not enjoyed by the states or territories and the act of the legislature now under consideration must be sustained, if at all, as being rightful legislation under the general police powers of the Territory. This distinction being recognized a solution of the question is rendered less difficult. Counsel for the Territory make no claim that the Territory possesses authority to legislate under what is known as war-power nor do they claim that the act in question is in any sense a war measure intended to affect the war status of the Federal government. They assert that the legislature was authorized under its general police power to pass the act and that the only effect the existence of the war had upon the legislation was that the war created an emergency which justified it. The issues are thus narrowed and it becomes only necessary to determine whether under the Federal Constitution the legislature of Hawaii possesses authority to regulate the prices at which foods and other articles of commerce may be sold in normal times, and if such authority does not exist, yet, whether by reason of the present abnormal condition of the times, the authority for the legislation does exist.

Aside from the right of the state to take the property of the citizen for public uses upon just compensation being made therefor it may take a portion of his property by way of taxation in support of the government. It may control the use and possession of his property so far as may be necessary for the protection of the rights of others and to secure to them the equal use and enjoyment of their property. It may exercise control over the property of the citizen even to the extent of destroying it to arrest a conflagration or the ravages of pestilence or it may take it under the pressure of an immediate and overwhelming necessity to prevent a public calamity.

The act in question had for its purpose the increase, conservation, regulation and control of food supplies within the Territory. It is not recited in the act itself nor is it otherwise made to appear that at the time of the passage of the enactment there was an immediate and overwhelming necessity for the legislation in order to prevent a public calamity, and while there may have existed a greater reason for an exercise of legislative control of the price of rice by reason of the existence of the state of war yet the law cannot be justified upon that ground. In other words, if the legislature of the Territory possessed the authority to enact the law during war times it possessed an equal authority to do so in peace times.

The controlling question in this case is, Do the provisions of section 8 of Act 221 of the Session Laws of 1917, in so far as they attempt to confer upon the food commission of the Territory by said act created the power and authority to fix, or to control by fixing, in advance, or otherwise, the price or prices at which food shall be sold in the Territory of Hawaii, abridge the privileges and (or) immunities of citizens of the United States or deny to defendant equal protection of the laws or deprive defendant of property without due process of law, and in these respects are they contrary to the provisions of articles 5 and 14 of the amendments to the Constitution of the United States? The point has been made that this court has already expressed the opinion that the fourteenth amendment to the Constitution of the United States applies only to states and does not apply to the territories. *Robertson* v. *Pratt*, 13 Haw. 590, 598. While we are not prepared to say that we would concur in the former expressions of this court thus announced it is conceded that article 5 of the amendments to the Federal Constitution does apply to the territories. This amendment provides that no person shall be deprived of life, liberty or property without

due process of law, nor shall private property be taken for public use without just compensation.

Counsel for the Territory submit that the territorial statute and the regulations of the commission fixing the price of rice constitute a proper exercise of the police power of the Territory and are not prohibited by article 5 of the amendments to the Constitution. Counsel cite in support of their position various statutes regulating the use of private property which have been sustained by the courts throughout the land, among which are statutes regulating common carriers and railroads, inn-keepers, wharfingers, ferrymen, millers, warehousemen, companies supplying water and gas, stockyard companies, telephone and telegraph companies, places of amusement, hackmen, and the protection and preservation of wild game, and statutes regulating the interest on money. The fixing of maximum rates of interest has always been upheld without question, the long established historical usage being regarded as sufficient justification. It is only the assertion of a right of government to control the extent to which a privilege granted by it may be exercised and enjoyed. By the ancient common law it was unlawful to take any money for the use of money and all who did so were called usurers—a term of great reproach—and were exposed to the censure of the church; and if after the death of a person it was discovered that he had been a usurer while living his chattels were forfeited to the king and his lands escheated to the lord of the fee. No action could be maintained on any promise to pay for the use of money because of the unlawfulness of the contract. While the common law thus condemned all usury Parliament interfered and made it lawful to take a limited amount of interest. The regulation of grist mill tolls has been sustained upon the ground that from the early colonial times mills have always been aided by legislation in the public interest. Leg-

islation regarding railroad charges was sustained for the
reason that the business of a railroad calls for extraor-
dinary legal privileges in the exercise of eminent domain— .
has some of the features of a *de jure* as well as of a *de
facto* monopoly. In the majority opinion of the court in
the renowned case of *Munn* v. *Illinois*, 94 U. S. 113, the
constitutionality of the state legislation fixing warehouse
rates was sustained upon the ground that the business of
grain elevators in the city of Chicago, a "gateway of com-
merce," constituted a virtual monopoly. The same may
be said of the decision in *Budd* v. *New York*, 143 U. S. 517.
These were known as the granger cases, and in both cases
strong dissenting opinions were rendered. In *Spring
Valley Water Co.* v. *Schottler*, 110 U. S. 347, it was held
that the state may regulate the price of water if the supply
is monopolized. When the constitutional power to regu-
late prices and charges is examined on principle it will be
found to extend only to those classes of business claiming
special privileges at the hands of the community. In
nearly all cases the privilege is of such character that it
cannot be indiscriminately given and therefore the busi-
ness constitutes a *de jure* monopoly and in all cases the en-
joyment of special privileges removes the business from a
condition of equality with purely private enterprises. The
enjoyment of special rights and powers demands and jus-
tifies the exercise of special control. This consideration
applies to all enterprises in behalf of which the power of
eminent domain is exercised or which use public highways
in a special and exclusive manner: railroads, canals,
bridges, turnpikes, telegraph, telephone, water, gas and
electric conduits; the right to keep a ferry being treated
as a franchise falls under the same principle. A mill which
uses water-power is very commonly granted special priv-
ileges in regard to overflow. The keepers of cabs and
hacks enjoy special rights if they have permanent stands

on city streets. The opinions in the granger cases strongly relied upon the monopolistic character of the business. The monopoly in these cases was not a legal one but it was held to exist virtually and *de facto*. The argument of special privileges does not avail in such a case to justify the regulation of charges, but since the common regulating factor, competition, is absent, a condition is presented which calls for the exercise of the police power for the prevention of oppression. The police power is exercised for the prevention of monopolies where they rest upon preventable machinations; it follows that where a monopoly is inevitable by reason of natural conditions the power must exist to minimize its detrimental effects. Where physical conditions are naturally limited for carrying on some business a case arises for special control, and this will often be true of mill and wharf rights; but it is also possible that economic conditions will tend to make a business a monopoly. See Freund on Police Power, pp. 387, 388.

The power of the legislature to prescribe a closed season for game and fish, even though the same may incidentally affect game and fish privately owned and propagated, has always been treated as within the proper domain of the police power. See *Lawton* v. *Steele,* 152 U. S. 133; *People* v. *Bridges,* 142 Ill. 30, 41; *Territory* v. *Hoy Chong,* 21 Haw. 39.

So far as we are advised, aside from the act of the legislature of Hawaii now under consideration, no state or territory in the United States has ever enacted a law which attempted to fix the prices of farm products or other commodities privately owned, which are not impressed with a public interest as hereinabove defined, and no court, either Federal or state, has ever by expression or by inference indicated that any such a law could find justification under the police power of the state. The only

regulation of this kind which has come to our attention is to be found in *City of Mobile* v. *Yuille,* 3 Ala. 137. That was an ancient case where a power granted to the city of Mobile to license bakers and to regulate the weight and price of bread was sustained so far as regulating the weight of bread was concerned, no question being raised as to the right to regulate the price. Whenever the power of a state legislature to fix the price which shall be received by one for his property, when the same is not impressed with a public interest, has had the attention of American courts, the expressions have been uniformly to the effect that no such power exists. Perhaps the strongest language to be found upon this subject is employed in the celebrated associated press case found in *State ex rel.* v. *Associated Press,* 159 Mo. 410, 438, 439, 441, where the following language of Judge Cooley is quoted with approval: "In the early days of the common law it was sometimes thought necessary, in order to prevent extortion, to interfere, by royal proclamation or otherwise, and establish the charges that might be exacted for certain commodities or services. The price of wages was oftener regulated than that of anything else, the local magistrates being generally allowed to exercise authority over the subject. The practice was followed in this country, and prevailed to some extent up to the time of independence. Since then it has been commonly supposed that a general power in the state to regulate prices was inconsistent with constitutional liberty." The Missouri court quotes from another eminent authority: "In other words, it was assumed to be a part of the natural and civil liberty guaranteed by American institutions to form business relations and to make contracts free from state interference, and this was thought to include the right of everyone to ask for his wares or services whatever price he was able to get and others were willing to pay." And

upon this subject the court further says: "He would indeed be regarded as a bold innovator, if not a madman, who, keeping within the lines marked out in Munn's case, and following the premises there laid down, to their logical conclusion, should offer a bill establishing the maximum rates at which wheat, pork, etc., could be sold, or merchandise or wares of the shoemaker or the potter or the blacksmith."

Of course, strictly speaking, it may truthfully be said that the public have an interest in the price at which every commodity which is used by the public is sold but this general interest is not sufficient to confer upon the legislature the power to control or regulate the price of such commodities. "The mere fact that the public have an interest in the existence of the business and are accommodated by it cannot be sufficient for that would subject the stock of the merchant and his charges to public regulation. The public have an interest in every business in which an individual offers his wares, his merchandise, his services, or his accommodations to the public, but his offer does not place him at the mercy of the public in respect to charges and prices." Cooley's Const. Lim. p. 736. "The police power is broad in its scope but it is subject to the just limitation that it extends only to such measures as are reasonable in their application and which tend in some appreciable degree to promote, protect or preserve the public health, morals or safety or the general welfare. The prohibition of an act which the court can clearly see has no tendency to affect, injure or endanger the public in any of these particulars and which is entirely innocent in character is an act beyond the pale of this limitation and it is therefore not a legitimate exercise of police power." *Ex parte Quarg,* 84 Pac. 766; *People* v. *Steele,* 231 Ill. 340.

It is a matter of common knowledge that rice is grown

in Hawaii in small quantities by numerous producers throughout the Territory and that the total output is small. There is no claim that the defendant or any other person enjoys a monopoly of this commodity and it must be conceded that if the legislature can properly control the price at which Hawaiian-grown rice may be sold it may with like authority regulate the prices of all other commodities, whether they be sugar, pineapples, clothing, groceries, hardware or other articles used or consumed by the public. And why then should not the contractor and the professional man be subject to this paternal legislation, and why may not the legislature fix the price and value of the services of the laborer? The law is clearly one of those enactments the danger of which was foreshadowed by the supreme court of California in *Ex parte Jentzsch,* 112 Cal. 468, 473, where it said: "So while the police power is one whose proper use makes most potently for good in its undefined scope and inordinate exercise lurk no small danger to the republic. For the difficulty which is experienced in defining its just limits and bounds affords a temptation to the legislature to encroach upon the rights of citizens with experimental laws none the less dangerous because well meant." One of the incidents of the ownership of property is the right to sell and dispose of it. Where the right to sell is abridged, to the extent of the curtailment of that right is the owner deprived of his property. "The Constitution insures to every person liberty and the protection of his property rights, and provides that he shall not be deprived of life, liberty or property without due process of law. The liberty of the citizen includes the right to acquire property, to own and use it, to buy and sell it. It is a necessary incident to the ownership of property that the party shall have the right to sell or barter it and this right is protected by the Constitution as such an incident of ownership." *Chicago* v.

*Netcher,* 48 L. R. A. 261; *Third National Bank* v. *Divine Grocery Co.,* 34 L. R. A. 445.

We doubt not that the legislature which enacted this law was inspired by the loftiest and most patriotic motives, but the evils flowing from the assumption of power to determine the compensation a man may receive for the use of his property have been ignored resulting in an invasion of the personal rights and liberties of the citizen guaranteed to him by the Federal Constitution. If the legislative enactment is to be held valid then there is no length to which legislative regulation may not extend. The prices of the wares of the butcher, the baker and the candlestick maker will all be rightful subjects of regulation. The government established by the great men who framed the Federal Constitution will be transformed and we shall have in its stead government paternalism carried to an extreme never heretofore contemplated. A doorway full of subtleties will be opened which we fear may lead to disastrous results. The rights of the citizen will be restricted and the powers of the government extended in a degree unknown in America since the adoption of the Constitution and unknown in England since the days of 'blind zeal and pious cruelty.' Individual industry and efforts will cease to be worth while.

We are unwilling to go beyond the doctrine laid down by the Supreme Court of the United States in the granger cases and we hold that it is unlawful to interfere with the privileges of the individual to seek and obtain such compensation as he can for his private property where he neither asks nor receives from the sovereign power any special right or immunity not given to or possessed by every other citizen and where he has not devoted his property to any public use so that the same becomes impressed with a public interest within the meaning of the law. The objects of the territorial statute, in so far as the same at-

tempts to protect the community against unreasonable, discriminatory or unfair prices of food, are fully accomplished by the Federal Food Control Act by which, under the war-power of Congress, all those engaged in the business of distributing (including buying and selling) rice and other commodities are subject to a presidential license which may be revoked if unreasonable, discriminatory or unfair prices are exacted and subjecting any offending party to severe punishment at the hands of the Federal government.

The third question propounded in the reserved questions submitted by the circuit court is answered in the affirmative. This conclusion necessarily results in a disposition of the case favorably to defendant and we deem it unnecessary to pass upon the other reserved questions and therefore return the same unanswered.

*C. H. Olson* and *A. M. Cristy,* First Deputy City and County Attorney (*A. M. Brown,* City and County Attorney and *R. B. Anderson* on the brief) for the Territory.

*E. C. Peters* for defendant.