JAMES MAGNER

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Filed at Ottawa February 3, 1881.*

1. GAME LAW—*section 2 construed.* Section 2 of the Game law of 1879, which makes it unlawful for any person to buy, sell or have in possession for the purpose of sale any of the wild fowls, birds, etc., mentioned in section 1 of the act, at any time when the trapping, netting or ensnaring of the same shall be unlawful, which shall have been entrapped, netted or ensnared contrary to the provisions of the act, has reference only to wild fowls, birds, etc. within this State.

2. SAME—*possession or sale of birds killed in another State unlawful.* But under section 6 of the act the sale, exposing for sale or having possession for the purpose of selling any of the animals, wild fowls or birds mentioned in section 1, after the expiration of five days next succeeding the first day of the period in which it shall be unlawful to kill, trap or ensnare such animals, wild fowls or birds, etc., is made unlawful, and this without regard to the place where they were killed. The section applies to a person who has in his possession and who sells quails, etc., killed in the State of Kansas, and which have been shipped to him in this State.

3. SAME—*its constitutionality.* The ownership of wild animals, wild fowl and birds being in the people of the State, in trust for all its citizens, and no

one having a property right in them to be affected, it results that the legislature, as the representative of the people, may withhold or grant to individuals the right to hunt or kill game, or qualify and restrict it to certain times in the year, as it may consider will best subserve the public welfare. To hunt or kill game is a boon or privilege granted either expressly or impliedly by the sovereign authority.

4. SAME—*not in violation of the constitution of the United States.* The sixth section of the Game law of 1879, making it unlawful to have possession of certain game for the purpose of sale, or the selling or attempting to sell the same, in this State, unlawful, though killed in another State and sent to a purchaser in this State, is not in contravention of the third clause of sec. 8, art. 1, of the constitution of the United States, which confers upon Congress power to regulate inter-State commerce. When such game comes into this State and into the possession of a citizen of the State, the police power of the State attaches, and the sale may be prohibited, although such prohibition may discourage importations.

5. STATUTE—*expressing subject in the title of the act.* The title of the Game law of 1879, "An act to revise and consolidate the several acts relating to the protection of deer, wild fowl and birds," sufficiently expresses the subject of the act, within the requirement of sec. 13, art. 4, of the constitution, prohibiting the possession for sale of such animals, wild fowl and birds brought from another State, having a tendency to protect the same by preventing evasions of the law.

APPEAL from the Criminal Court of Cook county; the Hon. JOHN A. JAMESON, Judge, presiding.

This is a prosecution for an alleged violation of sections 1, 2 and 6 of what is known as the Game law of this State, entitled "An act to revise and consolidate the several acts relating to the protection of game, and for the protection of deer, wild fowl and birds," approved May 14, 1879.

Section 1 is as follows: " That it shall be unlawful for any person or persons to hunt or pursue, kill or trap, net or ensnare, or otherwise destroy, any wild buck, doe or fawn, or wild turkey, between the fifteenth day of January and the first day of September of each and every year; or any pinnated grouse or prairie chicken between the first day of December and the fifteenth day of August of the succeeding year; or any quail or ruffed grouse between the first day of January and the first day of October of each

and every year; or any wild goose, duck, brant or other water fowl between the first day of May and the fifteenth day of August of each and every year. And it shall further be unlawful to shoot, kill or destroy, or attempt to shoot, kill or destroy, any wild goose, duck, brant or other wild fowl during the night time, at any season of the year; or any woodcock between the first day of January and the fourth day of July in each and every year. And any person so offending shall, for each and every offence, be deemed guilty of a misdemeanor, and on conviction shall be fined in any sum not less than five dollars nor more than twenty-five dollars, and costs of suit, and shall stand committed to the county jail until such fine is paid: *Provided,* that such imprisonment shall not exceed ten days, and the killing .of each bird or animal, as specified herein, shall be deemed a separate offence."

Section 2 is as follows: "It shall be unlawful for any person to buy, sell or have in possession any of the animals, wild fowls or birds mentioned in section one of this act, at any time when the trapping, netting or ensnaring of such animals, wild fowls or birds shall be unlawful, which shall have been entrapped, netted or ensnared contrary to the provisions of this act; and any person so offending shall, on conviction, be subject to the same fine and penalties, to be enforced and collected in the same manner as is provided in section one of this act."

Section 6 is as follows: "No person or persons shall sell, or expose for sale, or have in his or their possession for the purpose of selling or exposing for sale, any of the animals, wild fowls or birds mentioned in section one of this act, after the expiration of five days next succeeding the first day of the period in which it shall be unlawful to kill, trap or ensnare such animals, wild fowls or birds. Any person so offending shall, on conviction, be fined and dealt with as specified in section one of this act; and selling, exposing for sale, or having the same in possession for the purpose of sell-

ing or exposing for sale, any of the animals or birds after the expiration of the time mentioned in this section, shall be *prima facie* evidence of the violation of this act: *Provided,* that the provisions of this act shall not apply to the killing of birds by or for the use of taxidermists for preservation, either in public or private collections, if so preserved."

And the 7th section is as follows: "The provisions of this act shall not be construed as applicable to any express company or common carriers into whose possession any of the animals, wild fowl or birds herein mentioned shall come in the regular course of their business for transportation, whilst they are in transit through this State from any place without this State where the killing of said animals, wild fowl or birds shall be lawful. But notwithstanding this provision, the having or being in possession of any such animals, wild fowl or birds as are mentioned in section one, upon any of the days upon which the killing, entrapping, ensnaring, netting, buying, selling or having in possession any such animals, wild fowl or birds, shall be unlawful by the provisions of this act, shall be deemed and taken as *prima facie* evidence that the same was ensnared, trapped, netted or killed in violation of this act."

The facts are embodied in the following statement of agreed case:

" The above case, now being in the above entitled court, on appeal from George A. Meech, justice of the peace of Cook county, said appeal having been taken by said defendant for the purpose of presenting the questions involved in said case, so that an early determination thereof be reached. The following facts are agreed upon:

" 1.   That James Magner is a retail dealer in game, and keeps a game market at 76 Adams street, in the city of Chicago, in said Cook county; that on January 14, 1880, said James Magner bought on South Water street, in said city of Chicago, of a certain dealer, one box of quail, containing 144

quail; that said Magner took said box of quail to his said market, and sold said quail at retail, in different amounts; that on the 15th day of January, 1880, said Magner sold to one James J. Gore, twelve quail, being part of said box of 144 quail, at said market, said Magner and Gore both being citizens of the State of Illinois; that said quail were bought in the State of Illinois, on January 14, 1880, and sold in the State of Illinois, on January 15, 1880.

"2.   That said James Magner, a citizen of Illinois, bought of William Johnson, of Leavenworth, in the State of Kansas, at said Leavenworth, one box of quail, containing 144 quail, on December 20, 1879; that said box of quail, at said date, was shipped directly to said Magner, at his said market, and, on December 23, received by him; that said Magner sold said box of quail at said market, to said James J. Gore, on January 15, 1880, said Gore being a citizen of the State of Illinois.

"3.   That said James Magner bought a box of quail, in Leavenworth aforesaid, on January 10, 1880, and sold the same at said city of Chicago, on January 15, 1880, to said James J. Gore, said Gore and Magner being citizens of the State of Illinois.

"4.   That said James Magner bought said box of quail, containing 144 quail, in Leavenworth, as aforesaid, on January 10, 1880, and retailed, (not sold in bulk or original package,) said quail, and sold twelve of said quail to said James J. Gore, on January 15, 1880, at said city of Chicago, both said Magner and Gore being citizens of the State of Illinois.

"5.   That said James Magner bought said box of quail in Leavenworth aforesaid, on December 20, 1879, and retailed (not sold in bulk or original package) said quail, and sold twelve of said quail to said James J. Gore, on January 15, 1880, said Magner and Gore both being citizens of the State of Illinois.

"6.   That said James Magner, being a citizen of the State of Illinois, and doing business as aforesaid, in said city of

Chicago, as an importer from another State, bought one box of quail, containing 144 quail, from a citizen of Kansas, on December 20, 1879, and sold said box of quail, in the original package, to one Thomas Jones, a citizen of New York, at said market, on January 15, 1880.

"7. That said James Magner, being a citizen of the State of Illinois, and doing business in the place aforesaid, as an importer from another State, bought one box of quail, containing 144 quail, of a citizen of Kansas, January 10, 1880, and sold said box of quail in the original package, to one Thomas Jones, a citizen of New York, at said market, on January 15, 1880.

"8. That said James Magner, being a citizen of the State of Illinois, and doing business as aforesaid, in said city of Chicago, as an importer from another State, bought one box of quail, containing 144 quail, from a citizen of Kansas, on December 20, 1879, and sold twelve of said quail (not the original package) to one Thomas Jones, a citizen of New York, at said market, in said city of Chicago, on January 15, 1880.

"9. That said James Magner, being a citizen of the State of Illinois, and doing business as aforesaid, in said city of Chicago, as an importer from another State, bought one box of quail, containing 144 quail, from a citizen of Kansas, on January 10, 1880, and sold twelve of said quail (not the original package) to one Thomas Jones, a citizen of New York, at said market, in said city of Chicago, on January 15, 1880.

"10. That said James Magner, a citizen of Illinois, sold forty-eight quail, at Chicago, to Thomas Jones, of New York, on January 15, 1880, said quail having been killed in Kansas, and shipped from there to said Magner, at the city of Chicago.

"11. It is also agreed, that game, in large quantities, killed in other States, is shipped to, and sold in, the city of Chicago; that a large trade of that character has grown up

in said city of Chicago, amounting to at least $200,000 per year; and also a large amount of game from the State of Illinois is sold in said city of Chicago.

"12. It is also agreed, that the game covered by this case, was in entirely fit condition for use as food, as far as game can be during the season the game law of the State has forbidden the killing or sale of the same.

"13. It is agreed, that the game laws of each and all the States may be considered as in evidence."

The prosecution was commenced before a justice of the peace of Cook county. Judgment was there rendered against appellant, from which he appealed to the circuit court of that county. The trial in that court also resulted in a judgment against appellant, on each specification wherein was an admission of fact, as before herein set forth.

The present appeal is prosecuted to reverse that judgment.

Mr. EMERY A. STORRS, for the appellant, after stating the facts, and citing the various sections of the Game law applicable, made the following points:

Excepting the first count of the agreed case, the record fails to disclose any act on the part of the defendant that is in violation of the Game law.

The record affirmatively shows, that all the quail, except those mentioned in the first count, were imported from the State of Kansas, and therefore were not ensnared, etc., in violation of the Game law of this State.

It seems absurd to hold that the inhibition against the purchase and sale of game imported from the State of New York or Kansas is a protection to the game of this State.

Such a construction makes the act broader than its title, which would make it in violation of section 13, of article 4, of the State Constitution, which provides that the subject of every act shall be expressed in its title. Cooley's Const. Lim. 148; *Foley* v. *State,* 9 Ind. 363; *Gillespie* v. *State,* id. 380;

*State* v. *Lafayette*, 41 Mo. 39; *Commonwealth* v. *Hitchings*, 5 Gray, 485.

Whenever an act can be so construed as to avoid conflict with the constitution, such construction will be adopted. *Newland* v. *Marsh*, 19 Ill. 384.

If the act makes it a penal offence to have quail in one's possession, from January first to October first, of each and every year, no matter where they were caught or killed, then it is in violation of that provision of the constitution of the United States which confers upon Congress the power to regulate commerce among the several States.

Mr. LUTHER LAFLIN MILLS, State's Attorney, and Messrs. PALMER & DURKEE, for the People, made the following, among other points:

A State legislature, unless prohibited by State or United States constitution, is as absolute, omnipotent and uncontrolable as Parliament. *Mason* v. *Wait*, 4 Scam. 134; *People* v. *Reynolds*, 5 Gilm. 1; *Munn* v. *The People*, 69 Ill. 88, and 94 U. S. 124.

All power may be abused, and if the fear of abuse is to constitute an argument against its existence, it might be urged against the existence of that which is indispensable to the general safety. *Brown* v. *State of Maryland*, 12 Wheat. 440.

The State never surrendered its police powers.

Many acts of a State may, indeed, affect commerce, without amounting to a regulation of it, in the constitutional sense of the term, and it is sometimes difficult to define the distinction between that which merely affects or influences, and that which regulates or furnishes a rule of conduct. *Munn* v. *Illinois*, 94 U. S. 135; State Tax on R. G. Receipts, 15 Wall. 293.

In cases of implied limitations or prohibitions, it is not sufficient to show a possible or potential inconvenience,—there must be a plain incompatibility, a direct repugnancy or an

extreme potential inconvenience leading to the same result. 1 Story, 432.

This court will not declare a law of a State unconstitutional, unless the opposition between the constitution and the law be clear and plain. *Fletcher* v *Peck*, 6 Cranch, 87.

The courts of New York and Missouri have decided a law similar to the one in question, to be constitutional. *The State* v. *Saunders*, 19 Kan. 127, does not touch the present question..

The act does not violate the constitution of the United States. The protection of game is a public advantage, to which private interests may be made to yield to some extent. The constitution of the United States does not expressly prohibit the passage of game laws by the several States; nor is there any act of Congress professing to regulate the traffic between the States in game. *Phelps* v. *Racey*, 60 N. Y. 10; *State* v. *Randolph*, 1 Mo. App. 15.

By the grant in the constitution, that Congress shall have power to regulate commerce with foreign nations, among the several States and with the Indian tribes, Congress did not obtain exclusive control. *Sturgis* v. *Crowningshield*, 4 Wheat. 122; *Moore* v. *Houston*, 5 id. 1; *Groves* v. *Slaughter*, 15 Pet. 509; License Cases, 5 How. 504; *Hinson* v. *Lott*, 8 Wall. 152; *Woodruff* v. *Parhan*, 8 id. 140; *Veazie* v. *Moore*, 14 How. 574; *Osburn* v. *Mobile*, 16 Wall. 482; *Ex parte McNeil*, 13 id. 242; *Crandall* v. *Nevada*, 6 id. 43; *Nathan* v. *Louisiana*, 8 How. 73; *Paul* v. *Virginia*, 8 Wall, 184; *Railroad Co.* v. *Fuller*, 17 Wall. 560; *Lottawanna*, 21 id. 558; *Sherlock* v. *Alling*, 93 U. S. 104; *Munn* v. *Illinois*, 94 id. 135; *Ward* v. *Maryland*, 12 Wall. 418; *State Freight Tax Case*, 15 id. 276; *Pervear* v. *Commonwealth*, 5 id. 479.

There is a line of decisions, that where a "national rule" is not required the States may act. *Cooley* v. *Board of Wardens*, 12 How. 315; *Gilman* v. *Philadelphia*, 3 Wall. 713; *Wilson* v. *Blackbird Creek Manf. Co.* 2 Pet. 245; *Crandall* v. *Nevada*, 6 Wall. 43.

The States have always protected fish and game, and their' power has been admitted by the acquiescence of the Federal government.

The States can better control this question than Congress.

Congress has no power over the subject. *License Case*, 5 How. 630; *N. Y. City* v. *Miln*, 11 Pet. 102, 148; *Groves* v. *Slaughter*, 15 id. 506; *Prigg* v. *The Commonwealth*, 16 id. 625; *U. S.* v. *De Witt*, 9 Wall. 45.

Under the police power of the State this law can be upheld. *Yeazel* v. *Alexander*, 58 Ill. 258; *Chicago & Alton Railroad Co.* v. *Gassoway*, 71 id. 570; *Toledo, Wabash & Western Railroad Co.* v. *City of Jacksonville*, 67 id. 40; *Munn* v. *The People*, 69 id. 92; *N. Y. City* v. *Miln*, 11 Pet. 102; *Fertilizing Co.* v. *Hyde Park*, 97 U. S. 659; *Graves* v. *Slaughter*, 15 Pet. 606; *Beer Co.* v. *Mass.*, 97 U. S. 25; *U. S.* v. *De Witt*, 9 Wall. 41; *Slaughter House Case*, 16 id. 36; *Thorpe* v. *Rutland and B. R. Co.* 27 Vt. 149.

Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court:

The grounds upon which it is argued the judgment below should be reversed, are—

1st. Because the statute does not condemn the possession or sale of quail taken and killed beyond the limits of the State, which is subsequently shipped into the State for sale.

2d. Because if the statute shall be held to condemn such possession and sale, then, in its enactment, so much of § 13, art. 4, of the State constitution, as requires that the subject of every act shall be expressed in its title, was disregarded, and hence it is not law.

3d. Because if the statute is free of all other objections, but shall be held to condemn the possession and sale of quail taken and killed beyond the limits of the State, it is void and not law, for the reason that it is in contravention of the third clause of § 8, of art. 1, of the constitution of the United States,

which confers upon Congress power to regulate commerce with the foreign nations and among the several States.

They will be examined in the order stated.

*First.*—The first section of the statute under consideration makes it unlawful for any person to hunt, pursue, kill or trap, net or ensnare, or otherwise destroy, any quail or ruffed grouse between the 1st day of January and the 1st day of October of each and every year. The second section makes it unlawful for any person to buy, sell or have in possession any of the wild fowls, birds, etc., mentioned in section one, at any time when the trapping, netting or ensnaring of such wild fowls, birds, etc., shall be unlawful, which shall have been entrapped, netted or ensnared contrary to the provisions of the act. This is manifestly but equivalent to saying that it shall be unlawful to buy, sell or have in possession between the 1st day of January and the 1st day of October in each and every year, any of the wild fowls, birds, etc., specified in section one, which shall have been entrapped, netted or ensnared contrary to the provisions of that section. Very clearly this section has reference only to wild fowls, birds, etc., within this State.

But section six is more comprehensive in its language than either section one or section two. It is: "No person or persons shall sell or expose for sale, or have in his or their possession for the purpose of selling or exposing for sale, any of the animals, wild fowls or birds mentioned in section one of this act, after the expiration of five days next succeeding the first day of the period in which it shall be unlawful to kill, trap or ensnare such animals, wild fowls or birds," etc. No exception whatever is made with reference to the time when or place where such "animals, wild fowls or birds" shall have been killed, trapped or ensnared, but the language, as plainly as language can, includes *all* animals, wild fowls and birds.

That this was intended, is further manifest from the language of the seventh section, which declares: "The provi-

sions of this act shall not be construed as applicable to any
express company or common carrier in whose possession any
of the animals, wild fowls or birds herein mentioned shall
come in the regular course of their business for transportation,
whilst they are in transit through this State from any place
without this State where the killing of said animals, wild
fowls or birds shall be lawful," thus, in effect, declaring that
but for this qualification the provisions of the act, in such
cases, would be applicable to such express companies and
common carriers.

But, it is argued this can not be the correct construction,
because such a prohibition does not tend to protect the game
of this State. To this there seem to be two answers: First,
the language is clear and free of ambiguity, and, in such case,
there is no room for construction,—the language must be held
to mean just what it says. Second, it can not be said to be
within judicial cognizance that such a prohibition does not
tend to protect the game of this State. It being conceded, as
it tacitly is, by the argument, that preventing the entrap-
ping, netting, ensnaring, etc., of wild fowls, birds, etc., during
certain seasons of the year, tends to the protection of wild
fowls, birds, etc., we think it obvious that the prohibition of
*all* possession and sales of such wild fowls or birds during the
prohibited seasons would tend to their protection, in exclud-
ing the opportunity for the evasion of such law by clandes-
tinely taking them, when secretly killed or captured here,
beyond the State and afterwards bringing them into the State
for sale, or by other subterfuges and evasions.

It is quite true that the mere act of allowing a quail netted
in Kansas to be sold here does not injure or in anywise affect
the game here ; but a law which renders all sales and all
possession unlawful, will more certainly prevent any pos-
session or any sale of the game within the State, than will a
law allowing possession or sales here of the game taken in
other States. This is but one among many instances to be
found in the law where acts, which in and of themselves
alone are harmless enough, are condemned because of the

facility they otherwise offer for a cover or disguise for the doing of that which is harmful.

A similar objection to the construction of the act, it seems, was raised in *Whitehead* v. *Smithers*, (2 C. P. D. 553,) 21 Moak, 458. But Lord COLERIDGE, Ch. J., said: "I am of opinion that that argument is not well founded. It is said it would be a strong thing for the legislature of the United Kingdom to interfere with the rights of foreigners to kill birds. But it may well be, that the true and only mode of protecting British wild fowl from indiscriminate slaughter, as well as of protecting other British interests, is by interfering indirectly with the proceedings of foreign persons. The object is to prevent British wild fowl from being improperly killed, and sold under pretence of their being imported from abroad."

In that case, the wild fowl was shown to have been one of a consignment of dead plovers, received by a poulterer from Holland, and it was held that its sale was prohibited by general language, like that of the section under consideration, prohibiting all sales of such fowls.

In *Phelps* v. *Racey*, 60 N. Y. 10, the language of the statute was substantially the same as that of the 6th section. The defence there was that the bird—a quail—had been killed in the proper season, but had been kept by a process for preserving game, until after the season expired, and then offered for sale. The court said: "The penalty is denounced against the selling or possession after that time, irrespective of the time or place of killing. The additional fact alleged, that the defendant had invented a process of keeping game from one lawful period to another, is not provided for in the act, and is immaterial."

*Second.*—The title of the act is: "An act to revise and consolidate the several acts relating to the protection of game, and for the protection of deer, wild fowl and birds." We think this fully expresses the subject of the act. From the views expressed under the first point, it follows that we are

of opinion that the prevention of the possession and sale of *all* game, during the period designed to protect the same in this State from being taken or killed, may reasonably be regarded as a means necessary to the effectual protection of the game of this State. It was unnecessary to state the mode by which the game was to be protected, or the reasons which influenced the legislature in making the enactment. *Fuller* v. *The People*, 92 Ill. 182; *The People ex rel.* v. *Lœwenthal et al.* 93 id. 191; *Johnson* v. *The People*, 83 id. 431.

*Third.*—No one has a property in the animals and fowls denominated "game," until they are reduced to possession. 2 Kent's Com. (8th ed.) 416, *et seq.*; Cooley on Torts, 435. Whilst they are untamed and at large, the ownership is said to be in the sovereign authority,—in Great Britain, the king, —2 Blackstone's Com. (Sharswood's ed.) 409–10,—but, with us, in the people of the State. The policy of the common law was to regulate and control the hunting and killing of game, for its better preservation; and such regulation and control, according to Blackstone, belong to the police power of the government. 4 Com. (Sharswood's ed.) 174.

So far as we are aware, it has never been judicially denied that the government, under its police powers, may make regulations for the preservation of game and fish, restricting their taking and molestation to certain seasons of the year, although laws to this effect, it is believed, have been in force, in many of the older States, since the organization of the Federal government. On the contrary, the constitutional right to enact such laws has been expressly affirmed, in regard to *fish*, by Massachusetts, in *Burnham* v. *Webster*, 5 Mass. 266; *Nickerson* v. *Brackett*, 10 id. 212;—and by Indiana, in *Gentile* v. *The State*, 29 Ind. 409,—and, in regard to *game*, by New York, in *Phelps* v. *Racey*, *supra*; and by Vermont, in *State* v. *Norton*, 45 Vt. 258. And, upon principle, the right is clear.

The ownership being in the people of the State—the repository of the sovereign authority—and no individual hav-

ing any property rights to be affected, it necessarily results, that the legislature, as the representative of the people of the State, may withhold or grant to individuals the right to hunt and kill game, or qualify and restrict it, as, in the opinion of its members, will best subserve the public welfare.

Stated in other language, to hunt and kill game, is a boon or privilege granted, either expressly or impliedly, by the sovereign authority—not a right inhering in each individual; and, consequently, nothing is taken away from the individual when he is denied the privilege, at stated seasons, of hunting and killing game. It is, perhaps, accurate to say that the ownership of the sovereign authority is *in trust* for all the people of the State, and hence, by implication, it is the duty of the legislature to enact such laws as will best preserve the subject of the trust and secure its beneficial use, in the future, to the people of the State. But in any view, the question of individual enjoyment is one of public policy, and not of private right.

Our attention has been called to no law of Congress, and we are aware of none, in regard to the transportation of game, still, if this law may be regarded as a restriction upon inter-State commerce, that is of no importance, for it was held in *Welton* v. *State of Missouri*, 91 U. S. (1 Otto,) 275, that the non-exercise by Congress of its power to regulate commerce among the several States, is equivalent to a declaration by that body that such commerce shall be free from any restriction.

The inquiry, then, arises, is the prohibition of the possession and sale of game, as enacted in this statute, a restriction of inter-State commerce?

In *Gibbons* v. *Ogden*, 9 Wheaton, at p. 203, Chief Justice MARSHALL classifies as belonging to and forming a portion of that "immense mass of legislation, which embraces everything within the territory of a State not surrendered to a general government, all which can be most advantageously exercised by the States themselves," * * * "inspection

laws, quarantine laws, health laws of every description, as well as laws for regulating the internal commerce of a State, and those which respect turnpike roads, ferries, etc." And he adds: "No direct general power over these objects is granted to Congress, and, consequently, they remain subject to State legislation."

So, in *The Daniel Ball*, 10 Wallace, 564, the court said: "There is undoubtedly an internal commerce which is subject to the control of the States. The power delegated to Congress is limited to commerce 'among the several States,' with foreign nations, and with the Indian tribes. This limitation necessarily excludes from Federal control all commerce not thus designated, and of course that commerce which is carried on entirely within the limits of a State and does not extend to or affect other States."

And, upon this principle, in *The United States* v. *Dewitt*, 9 Wallace, 41, it was held that a statute of the United States making it a penal offence to mix naphtha and illuminating oils, was beyond the legislative authority vested in Congress. And it was said: "But this express grant of power to regulate commerce among the States, has always been understood as limited by its terms, and as a virtual denial of any power to interfere with the internal trade and business of the separate States."

In the celebrated *License Cases*, 5 Howard, 504, laws prohibiting sales of liquors except in large quantities and under stringent regulations, were sustained as within the police power, notwithstanding they interfered, indirectly, with inter-State commerce. Chief Justice TANEY said: "These State laws act altogether upon the retail or domestic traffic within their respective borders. They act upon the article after it has passed the line of foreign commerce, and become a part of the general mass of property in the State. These laws may, indeed, discourage imports, and diminish the price which ardent spirits would otherwise bring; but although a State is bound to receive and permit the sale by the importers of

any article of merchandise which Congress authorizes to be imported, it is not bound to furnish a market for it, nor to abstain from the passage of any law which it may deem necessary or advisable to guard the health or morals of its citizens, although such law may discourage importation or diminish the profits of the importers, or lessen the revenue of the general government."

So, upon like principle, it has since been held, that as a measure of police regulation, looking to the preservation of public morals, a State law entirely prohibiting the manufacture and sale of intoxicating liquors is not repugnant to any clause of the constitution of the United States. *Bootmeyer* v. *Iowa*, 18 Wall. 129; *Beer Co.* v. *Massachusetts*, (97 U. S.) 7 Otto, 25.

Very clearly this law relates only to the internal commerce of the State in the article of game. As in the *License Cases*, it acts altogether upon the retail or domestic traffic within the State, and, as there said, so may it be said here: "the State is not bound to furnish a market" for game, and, by parity of reasoning, is not bound to furnish game for a market.

And it would seem to be a legal truism, if a State may constitutionally prohibit the killing and possession of game during certain seasons, the prohibition of the transportation of game killed and possessed in violation of such prohibition can not be unconstitutional. There can not be a constitutional right to transport property which can not legally be brought into existence. The principle finds sanction in *Munn* v. *Illinois*, 94 U. S. (4 Otto,) 113; *Slaughter House Cases*, 16 Wall. 36; *Fertilizing Co.* v. *Hyde Park*, 97 U. S. (7 Otto,) 659.

The birds, which are here admitted to have been brought from Kansas, as appears by the laws admitted in evidence by the agreement of the parties, were there killed and possessed in violation of a law of that State, and hence never legitimately became an article of commerce.

There is no question here of discrimination in favor of the game of this State as against that of another State, so as to apply the doctrine of *Welton* v. *The State of Missouri, supra,* and kindred cases. Nor is there, as in *Railroad Co.* v. *Husen,* 95 U. S. (5 Otto,) 465, and other like cases, any question of the right to transport commerce from one State to another, for the 7th section of the statute expressly provides, that "the provisions of this act shall not be construed as applicable to any express company or common carrier into whose possession any of the animals, wild fowls or birds herein mentioned shall come, in the regular course of their business, for transportation, whilst they are in transit through this State from any place without this State, where the killing of said animals, wild fowls or birds shall be lawful."

And herein our statute is directly the opposite of the 6th section of the Kansas act, which was held unconstitutional in *The State* v. *Saunders,* 19 Kan. 127. There, the prairie chickens were lawfully killed, and lawfully became an article of commerce, and their transportation was prohibited. Here, the quail were unlawfully taken and killed, and their possession and sale in this State were unlawful; but, had they been lawfully taken and killed, their transportation to a place where they might be lawfully sold would not be interfered with, by the statute.

The questions we have been considering were all raised in *Phelps* v. *Racey, supra.* The opinion in that case, by the late Chief Justice of the Court of Appeals, is well considered, and reaches the same conclusion to which we have arrived.

The judgment is affirmed.

*Judgment affirmed.*