**ARKANSAS STATE GAME AND FISH COMMISSION v. W. R. WRAPE STAVE CO. et al.**

Civil Action No. L.R. 1677.

District Court, E. D. Arkansas, W. D.

March 1, 1948.

Clark & Clark and Wm. J. Clark, all of Conway, Ark., Neill Bohlinger and Ed E. Ashbaugh, both of Little Rock, Ark., Guy E. Williams, Atty. Gen., of Arkansas, and Oscar E. Ellis, Asst. Atty. Gen., of Arkansas, for plaintiff.

Watson, Ess, Barnett, Whittaker & Marshall and Samuel J. Molby, Jr., all of Kansas City, Mo., Wooten, Land & Matthews and Cooper B. Land, all of Hot Springs, Ark., and Elbert Cook, of De-Queen, Ark., for defendant Dierks Lumber & Coal Co.

Armistead, Rector & Armistead, and W. H. Rector, all of Little Rock, Ark., for defendant Magnolia Pipe Line Company.

D. K. Hawthorne, of Little Rock, Ark., for defendant W. R. Wrape Stave Co.

LEMLEY, District Judge.

This is an action instituted by the Arkansas State Game and Fish Commission in the Circuit Court of Faulkner County, Arkansas, to condemn sixty separate parcels of land in that county, containing approximately 7,000 acres, for, as stated in the petition, "a public purpose, to-wit: the erection and maintenance of a dam and lake for the purpose of propagation and conservation of the State's fish and game." After service was had upon the defendants in the state court, the defendant Dierks Lumber and Coal Company, a Delaware corporation, filed its petition for removal of the cause to this court, alleging a diversity of citizenship between it and the plaintiff. The cause in its entirety was removed, and now the plaintiff seeks to have the same remanded to the state court, claiming that there is no diversity of citizenship between it and Dierks or any of the other defendants, for the reason that the plaintiff is but an arm or alter ego of the State of Arkansas, and is therefore not a citizen within the meaning of the Removal Act. 28 U.S.C.A. § 71.

Briefs have been submitted by the plaintiff and by the defendants Wrape Stave Company, Dierks Lumber and Coal Company, and Magnolia Pipe Line Company; and two questions are presented: First, whether any part of the case is removable in view of plaintiff's aforesaid contention; and secondly, if the cause is removable as to the lands of Dierks, whether such removal operates as a removal with respect to all of the tracts involved in the action, regardless of the citizenship of the owners thereof, many of whom are citizens of the State of Arkansas. The briefs of plaintiff and Dierks are directed to both questions, and those of Wrape and Magnolia to the second question only. A decision in favor of the plaintiff on the first question will of course render the second moot.

As noted, the plaintiff Commission contends that it is but an arm or alter ego of the State, whereas it is the contention of Dierks that the plaintiff is an entity separate and apart from the State and is therefore a "citizen" within the meaning of the Removal Act.

 The rule is stated in 45 Am.Jur., Removal of Causes, Sec. 58, as follows:

"A state cannot, in the nature of things, be a citizen of any state; accordingly, a suit between a state and citizens is not one between citizens of different states and cannot be removed from a state to a Federal court on the ground of diverse citizenship, * * *. This rule necessarily assumes that the state as such in its governmental capacity is a real party in interest to the suit, * * *. In such a situation, the courts may look behind the nominal parties on the record to ascertain who are

the real parties to the suit, and determine by a consideration of the nature of the case as presented by the whole record whether the state is a real party in interest. * * *. The state is such real party when the relief sought is that which inures to it alone, and in its favor the judgment or decree, if for the plaintiff, will effectually operate."

And in Ex parte State of New York, 256 U.S. 490, 500, 41 S.Ct. 588, 590, 65 L.Ed. 1057:

"As to what is to be deemed a suit against a state, * * * it is now established that the question is to be determined not by the mere names of the titular parties but by the essential nature and effect of the proceeding, as it appears from the entire record."

A determination as to whether or not the State of Arkansas is the real party in interest here necessitates an examination into the laws of the State of Arkansas with respect to the powers and duties of the Arkansas State Game and Fish Commission, and the interest of the State in the subject matter of the action—in the property sought to be acquired thereby and the use to which it is to be put—and also, we think, into the nature of the State's interest in the fish and game which are to be protected by the proposed reserve.

With respect to the State's interest in the game and fish within its borders, Mr. Justice White in his learned opinion in Geer v. Connecticut, 161 U.S. 519, 16 S.Ct. 600, 604, 40 L.Ed. 793, traced the rights in such property from the earliest days down to the present time, citing treatises on the law of Athens, the civil law, and the common law of England, among other authorities, and said (quoting from the Supreme Court of Minnesota in State v. Rodman, 58 Minn. 393, 59 N.W. 1098): " 'We take it to be the correct doctrine in this country that the ownership of wild animals, so far as they are capable of ownership, is in the state, not as a proprietor, but in its sovereign capacity, as the representative and for the benefit of all its people in common.' " and added, quoting from Magner v. The People, 97 Ill. 320, 323: "It is, perhaps, accurate to say that the ownership of the sovereign authority is in trust for all the people of the state." See also 3 C.J.S.,

Animals, § 5, and cases cited; 36 C.J.S., Fish, § 3, and cases cited; Organ v. State, 56 Ark. 267, 19 S.W. 840; and LaCoste et al. v. Department of Conservation of the State of Louisiana, 263 U.S. 545, 44 S.Ct. 186, 68 L.Ed. 437.

█ In regard to the powers and duties of the Arkansas State Game and Fish Commission, it was created by Amendment No. 35 to the Constitution of Arkansas, which Amendment became effective July 1, 1945. The pertinent parts of this Amendment provide:

"Section 1. The control, management, restoration, conservation and regulation of birds, fish, game and wildlife resources of the State, including hatcheries, sanctuaries, refuges, reservations and all property now owned, or used for said purposes and the acquisition and establishment of same, the administration of the laws now and/or hereafter pertaining thereto, shall be vested in a Commission to be known as the Arkansas State Game and Fish Commission, to consist of eight members. Seven of whom shall be active and one an associate member who shall be the Head of the Department of Zoology at the University of Arkansas, without voting power."

That the first commissioners shall be appointed by the Governor, one from each Congressional District in the State, for terms of one, two, three, four, five, six and seven years, respectively; and upon expiration of their respective terms of office, a successor shall be appointed by the Governor for a term of seven years; that no commissioner can serve more than one term, and none can succeed himself. Sections 2 and 3.

"Section 4. Each Commissioner shall take the regular oath of office provided in the Constitution and serve without compensation other than actual expenses while away from home engaged entirely on the work of the Commission."

That Commissioners may be removed by the Governor only for the same causes as apply to other Constitutional officers, but vacancies on the Commission shall be filled by appointment of the Governor for the unexpired term; that upon failure of the Governor to fill the vacancy within

thirty days, the remaining Commissioners shall make the appointment for the unexpired term. A Chairman shall be elected annually from the members of the Commission, to serve one year. Sections 5 and 6.

"Section 7. The Commission shall elect an Executive Secretary, whose salary shall not exceed that of limitations placed on other constitutional departments; and other executive officers, supervisor, personnel, office assistants, wardens, game refuge keepers, and hatchery employees, whose salaries and expenditures must be submitted to the Legislature and approved by an Act covering specific items in the biennial appropriation as covered by Article XVI, Section 4 of the Constitution.

"Section 8. * * * The fees, monies, or funds arising from all sources by the operation and transaction of the said Commission and from the application and administration of the laws and regulations pertaining to birds, game, fish and wildlife resources of the State and the sale of property used for said purposes shall be expended by the Commission for the control, management, restoration, conservation and regulation of the birds, fish and wildlife resources of the State including the purchases or other acquisitions of property for said purposes and for the administration of the laws pertaining thereto and for no other purposes. All monies shall be deposited. in the Game Protection Fund with the State Treasurer and such monies as are necessary, including an emergency fund, shall be appropriated by the Legislature at each legislative session for the use of the Game and Fish Commission as hereto set forth. No monies other than those credited to the Game Protection Fund can be appropriated.

"All money to the credit or that should be credited to the present Game Protection Fund shall be credited to the new Game Protection Fund and any appropriation made by the Legislature out of the Game Protection Fund shall be construed to be for the use of the new Commission and out of the new Game Protection Fund.

"The books, accounts and financial affairs of the Commission shall be. audited by the State Comptroller as that department deems necessary, but at least once a year.

"Resident hunting and fishing license, each, shall be One and 50/100 Dollars annually, and shall not exceed this amount unless a higher license fee is authorized by an Act of Legislature.

"The Commission shall have the exclusive power and authority to issue licenses and permits, to regulate bag limits and the manner of taking game and fish and furbearing animals, and shall have the authority to divide the State into zones, and regulate seasons and manner of taking game, and fish and furbearing animals therein, and fix penalties for violations. No rule or regulations shall apply to less than a complete zone, except temporarily in case of extreme emergency.

"Said Commission shall have the power to acquire by purchase, gifts, eminent domain, or otherwise, all property necessary, useful or convenient for the use of the Commission in the exercise of any of its duties, and in the event the right of eminent domain is exercised, it shall be exercised in the same manner as now or hereafter provided for the exercise of eminent domain by the State Highway Commission. All laws now in effect shall continue in force until changed by the Commission. All contracts and agreements now in effect shall remain in force until the date of their expiration.

"This amendment shall not repeal, alter or modify the provisions of any existing special laws under the terms of which a County Game Commission has been created:

"The Commission shall be empowered to spend such monies as are necessary to match Federal grants under the Pittman-Robertson or similar acts for the propagation, conservation and restoration of game and fish."

It will have been noted that the Amendment provides: "All laws now in effect shall continue in force until changed by the Commission." In this connection, the pertinent Arkansas statutes which were in effect at the time of the adoption of the Amendment, are as follows:

Section 5871 of Pope's Digest of the Statutes of Arkansas 1937, which provides that all fees derived from licenses to hunt and fish shall be paid to the State Treasurer and shall constitute and be and remain in a separate fund to be known as the "Game Protection Fund," which fund shall be used for no purpose other than to pay the necessary expenses of the Game and Fish Commission (as constituted prior to the adoption of the Amendment).

Section 5918 of Pope's Digest, which provides: "Fines to 'Game Protection Fund.' All fines assessed against and collected from persons convicted for infractions of any of the provisions of this bill or any law of this State looking to the protection of game, fish, furbearing animals or fresh water mussels shall be paid to the county treasurer of the county wherein same is assessed and by him forwarded, as herein provided, to the State Treasurer who shall credit same to the 'Game Protection Fund.'"

And, incidentally, Section 5991 of Pope's Digest, which provides:

"Commission may acquire lands for refuges. Title in fee to such lands vests in State. The State Game and Fish Commission is hereby authorized to accept or acquire through gifts or purchase, on behalf of the State, suitable lands for the creation of game refuges. Such refuges to be designated and regulated as herein prescribed. Provided title in fee, including timber and mineral rights, vest in the State free of incumbrances and provided further that nothing in this act shall operate to relieve any lands of any State, county, district or other tax unless title in fee thereto is vested in the State."

It will also have been noted that Amendment No. 35 authorizes the Commission to acquire by eminent domain or otherwise all property necessary, useful or convenient for the use of the Commission in the exercise of any of its duties, and in the event that the right of eminent domain is exercised, it shall be done "in the same manner as now or hereafter provided for the exercise of eminent domain by the State Highway Commission." Section 6593 of Pope's Digest is the applicable statute in this regard. It reads:

"Manner of exercise of right of eminent domain. The State's right of eminent domain may be exercised by the State Highway Commission in the same manner as in the case of railroads, telegraph and telephone companies for the purpose of condemning any toll bridge or toll bridges other than state owned toll bridges and for condemning land for highways, bridges, and their approaches, for securing building material, and for any other use which said Commission may, under the laws of this State, require property for carrying out of enterprises entrusted to its supervision; but without the necessity of making a deposit of money before entering into possession of the property condemned." See also Section 6961 of Pope's Digest.

It is of interest to note in connection with the foregoing reference to the State Highway Commission, that as Section 5871 of Pope's Digest provides for a "Game Protection Fund" for the payment of the expenses of the Game and Fish Commission, so Section 6487 provides for a "State Highway Fund" for payment of the expenses of the State Highway Commission. Section 6487 is as follows:

"'State Highway Fund' created. There is hereby created a special fund in the State Treasury to be known as the 'State Highway Fund,' and hereafter all automobile fees, licenses and privilege taxes, motor vehicle fuel tax, Federal aid, and all other moneys received by the State from owners of motor vehicles in connection with the use of the public roads, shall be paid into this fund. The State Treasurer and the sureties of his official bond shall be responsible for all such funds and for Federal aid funds and all interest paid thereon to the same extent as for other state funds in the State Treasury or State depositories.

"The salary of the Chairman of the State Highway Commission, all expenses of the Highway Department, the expenses of the members of the State Highway Commission, the pay of all employees of the State Highway Commission, and all other expenses authorized to be incurred by the Commission, except where otherwise

provided for in this act, shall be paid in monthly installments out of the State Highway Fund.";

And, also, that as Section 4 of Amendment No. 35 requires that "each Commissioner shall take the regular oath of office provided in the Constitution," so Section 6490 of Pope's Digest requires that "all members of the State Highway Commission shall take oath provided in the Constitution for State Officers";

And, further, that if it can be said that Amendment No. 35 gives the Commission the power to sell lands under the control and management of the Commission (which we do not hold), so Section 6497 of Pope's Digest provides for the sale by the State Highway Commission of surplus real estate procured by or coming to it. Said section is as follows:

"Highway Commission authorized to sell surplus real estate. The State Highway Commission of the State of Arkansas is hereby empowered and authorized to sell and convey any surplus land or real estate, or any personal property or effects procured by or coming to the State Highway Commission, to which said Highway Commission or any member or officer therein holds title, or to which title was taken in the name of the State of Arkansas, in the settlement and procuring of rights of way for State Highways, when such lands so procured or obtained are not necessary for Highway purposes; * * *. And all proceeds arising from such sales shall be paid into and constitute a part of the State Highway Funds."

With reference to the monies out of which just compensation for the lands to be condemned in this action is to be paid, presumably they are to come from funds appropriated or to be appropriated by the Legislature out of the "Game Protection Fund." At any rate, the Arkansas General Assembly for the year 1945, by Act No. 153, appropriated $10,000 annually for two years from said fund for "acquisition and development of game refuges," and so forth. And the General Assembly for 1947, by Act No. 297, appropriated from said fund $30,000 per year for "Development of Game Refuges."

The foregoing sets forth the record, so to speak, upon which plaintiff's motion to remand is to be determined.

We are of the opinion that the Commission is a Constitutional department of the State of Arkansas, exercising in this action a part of the sovereign power of the State, and that the suit in effect is one brought by the State of Arkansas, and should therefore be remanded.

Section 1 of the Amendment gives to the Commission the control, management, restoration, conservation and regulation of the birds, fish, game and wildlife resources "of the State." These resources are owned by the State in its sovereign capacity for the use and benefit of all the people of the State. The Commission, the members of which serve without compensation, performs no duties except those done for and on behalf of the State. The Commissioners are appointed by the Governor, one from each Congressional District of the State. Each Commissioner is required to take the regular "oath of office provided in the Constitution," and he can be removed by the Governor for the same causes as apply to "other Constitutional Officers." The Amendment specifically provides that the salary of the Commission's executive secretary shall not exceed that of limitations placed on "other constitutional departments." The books and accounts of the Commission are required to be "audited by the State Comptroller." The use of the terms "oath of office provided in the Constitution," "other Constitutional Officers," "other Constitutional departments," and "audited by the State Comptroller," indicates that in voting this amendment the people had in mind the creation of a Constitutional department of the State of Arkansas, and not a quasi-public corporation separate and apart from the State. The funds of the Commission are derived from licenses granted by the State to individuals authorizing them to hunt the State's game and take the State's fish, and from fines realized from convictions of violations of the State's game and fish laws. These funds are first deposited in the State Treasury and thereafter are paid out only by act of the Legislature covering specific items in the biennial appropriations, as re-

quired by the State's Constitution. The Commission is unincorporated, and the Amendment does not subject it to suit in any court; neither does the Amendment authorize the Commission to sue except in the exercise of the State's power of eminent domain, which it is specifically provided shall be exercised in the same manner as provided for in the case of the State Highway Commission; and, as noted, Section 6593 of Pope's Digest, which provides for the manner of exercising such right, designates it as "the State's right of eminent domain." This right is merely being exercised by the Commission for the State.

It has been argued that Section 1 of the Amendment vests in the Commission the title to all property used by it for the purposes for which it was created. A careful reading of that section, however, leads to a different conclusion. The section provides: "The control, management, restoration, conservation and regulation of birds, fish, game, and wildlife resources of the State, including hatcheries, sanctuaries, refuges, reservations and all property now owned, or used for said purposes and the acquisition and establishment of same, the administration of the laws now and/or hereafter pertaining thereto, shall be vested in a Commission to be known as the Arkansas State Game and Fish Commission * * *." The title to the property is not thereby vested in the Commission. It is the control, management, restoration, conservation and regulation thereof with which the Commission is vested.

In this action the State's right of eminent domain is being exercised to acquire lands to be used for the preservation of game and fish which the State owns in its sovereign capacity for the use and benefit of all the people of the State, and the lands in question will be paid for with the State's money, and the ownership thereof when acquired will be in the State. Hence the State here is the real party in interest. "The relief sought is that which inures to it alone, and in its favor the judgment or decree * * * will effectually operate."

We have been cited to no case directly in point with the case at bar, nor have we found one in the course of our independent investigation. However, in Arkansas State Highway Commission v. Nelson, Bros., 191 Ark. 629, 87 S.W.2d 394, the Supreme Court of Arkansas held the State Highway Commission to be a State agency engaged in the discharge of the State's sovereign functions, and not a legal entity separate and apart from the State which would be subject to suit; and the analogy between the Arkansas statutes governing the State Highway Commission and the statutes and Constitutional Amendment governing the Arkansas State Game and Fish Commission, as shown above, is striking, and would lead one to believe that to some extent at least Amendment No. 35 was modeled after the laws creating and regulating the State Highway Commission.

Certain language used by the Supreme Court of Arkansas in the Nelson case is pertinent here. The court had previously held the State Highway Commission to be a legal entity or a juridic person which could be sued. In the Nelson case that court, in overruling all previous decisions and holding the Commission to be the State's alter ego, pointed out that the theory upon which it had previously held that the Highway Commission was not an agency of the State but a mere legal entity, was bottomed on the authority of State ex rel. State Highway Commission of Missouri v. Bates, 317 Mo. 696, 296 S.W. 418, and in connection with that case the Arkansas court said [191 Ark. 629, 87 S.W.2d 395]:

"In so far as we are advised, or our research extends, this case stands unique in the history of jurisprudence and the principle there announced that a body clothed with the powers of the state and delegated to perform its duties is not an agency of the state, but a mere legal entity (whatever that may be). We submit that this principle is based on neither reason nor authority, and the cases cited in support of it do not in fact lend support to that doctrine."

Continuing, the court said:

"If the power delegated and the duties to be performed by the highway commission are essentially public in their nature, then it must be the agent of the state, for in the nature of things the state must act through agents, and these, while in the discharge of public duties, stand in the place of the state. The highway commis-

sion, by the act creating it, is clothed with the power and the duty to construct, operate, and maintain highways. If these powers and duties rest primarily in the state, the highway commission, when clothed therewith, is something more than the 'legal entity' thought to be its status. * * * Public highways are for public use, * * *.

"If, then, the highway commission discharges duties primarily residing in the state, it must of necessity be the state's agent. This was the express holding in Dougherty v. Vidal, supra [37 N.M. 256, 21 P.2d 90], and in the Advisory Opinion to the Governor, 94 Fla. 967, 114 So. 850, 855. In the last case the court said: 'The road department is a state agency and component part of the state government. The product of its work is state property, it exercises a part of the sovereign power of the state, and its activities are supported by funds created by state taxes and federal aid funds.'"

In the instant case the Arkansas State Game and Fish Commission "exercises a part of the sovereign power of the State": It is conserving the State's game and fish; it is dealing with "State property"; its activities are supported by funds derived from license fees and fines imposed for violation of State laws.

In Allen Engineering Company v. Kays, 106 Ark. 174, 152 S.W. 992, 993, the Supreme Court of Arkansas, in holding the Board of Trustees of the State Agricultural School of the First District at Jonesboro, to be an arm of the State, in an action brought in replevin to recover certain property purchased by the Board under a conditional sales contract, said:

"Appellees (the Board) have no interest whatever in the property in their individual capacity, nor connection with it, except as representatives of the state, as trustees of said school. The school itself is but a governmental agency, not authorized by the statutes to sue and be sued, and the recovery is sought under the terms of the contract made with this governmental agency necessarily involving its rights, and being in effect and in fact but a suit against the state. No relief is sought against appellees in their individual capacity, and none

can be had against them as representatives of the agency of the state and its sovereignty; * * *."

See also Watson v. Dodge, 187 Ark. 1055, 63 S.W.2d 993; Cargile et al. v. New York Trust Co., 8 Cir., 67 F.2d 585; State Highway Commission in Arkansas et al. v. Kansas City Bridge Co., 8 Cir., 81 F.2d 679; Utah Construction Co. v. State Highway Commission of Wyoming, D.C. Wyo., 16 F.2d 322; State Highway Commission of Wyoming v. Utah Construction Co., 278 U.S. 194, 49 S.Ct. 104, 73 L.Ed. 262.

But the defendant Dierks contends that under the law as laid down by the Supreme Court of the United States, as well as that of the Eighth Circuit, that to constitute a state as the real party in interest, it is necessary that the state's treasury or its property be directly affected in a pecuniary sense, and that in the case at bar neither the State's treasury nor its property is so involved; and cites Missouri, Kansas and Texas Railway Company v. Missouri Railroad and Warehouse Commissioners, 183 U.S. 53, 22 S.Ct. 18, 46 L.Ed. 78, State of Missouri v. Homesteaders Life Ass'n, 8 Cir., 90 F.2d 543, and Reagan v. Farmers' Loan and Trust Company, 154 U.S. 362, 14 S.Ct. 1047, 38 L.Ed. 1014, in this connection. We do not think that the cited cases bear out Dierks' contention, nor that such is the rule in said courts.

In Missouri, Kansas and Texas Railway Company v. Missouri Railroad and Warehouse Commissioners, supra, the Board of Commissioners, a body created by the Missouri statute for the regulation of the railroads within the borders of the state, brought suit in the state court to obtain a decree commanding the railway company to comply with certain of its orders. The suit was removed to the federal court. A motion to remand was denied on the ground that the state was not the real party in interest. On appeal the Supreme Court affirmed the lower court and used the following language [183 U.S. 53, 22 S.Ct. 20]:

"Was the state the real party plaintiff? * * * it may fairly be held that the state is such real party when the relief sought is that which inures to it alone, and in its favor the judgment or decree, if for

the plaintiff, will effectively operate. Such a case was Ferguson v. Ross, 2 Cir., 38 F. 161, 3 L.R.A. 322. There an action was brought in the name of Ferguson, a shore inspector, against Ross and others, to recover a penalty. The statute of New York authorized the suit to be prosecuted in the name of the inspector, but all the moneys recovered were payable into the treasury of the state, and it was held by the circuit court for the eastern district of New York that the action was one in which the real party plaintiff was the state. It was for its sole benefit that the action was brought, and it alone was to be benefited by the recovery.

"But this case is not like Ferguson v. Ross, and does not come within the rule above stated. It is not an action to recover any money for the state. Its results will not inure to the benefit of the state as a state in any degree. It is a suit to compel compliance with an order of the railroad commissioners in respect to rates and charges. The parties interested are the railway company, on the one hand, and they who use the bridge, on the other; the one interested to have the charges maintained as they have been, the others to have them reduced in compliance with the order of the commissioners. They are the real parties in interest, and in respect to whom the decree will effectively operate."

The Supreme Court in this case did not hold or lay down a rule to the effect that in order for the State to be the real party in interest in litigation, either its property or its treasury must be directly affected in a pecuniary sense. The court simply said that in an action where all the monies to be recovered were to be paid to the treasury of the State for its sole benefit, the State was the real party in interest irrespective of whether the suit were brought in its name or not, and that Ferguson v. Ross was such a case. On the other hand, the court laid down what we consider to be the true rule, and that is "the state is such real party when the relief sought is that which inures to it alone, and in its favor the judgment or decree, if for the plaintiff, will effectively operate." In the case under discussion, the results would not inure to the benefit of the state as a state in any degree. Here the result does inure to the

benefit of the State as a state. There the parties interested were the railway company, on the one hand, and those who were to use the bridge, on the other, "the one interested to have the charges maintained as they have been, the others to have them reduced in compliance with the order of the commissioners." Here the only party interested is the State in its sovereign capacity as trustee for all the people of the State.

There is a class of cases, similar in fact to the Ferguson v. Ross suit, in which, as pointed out by the Eight Circuit Court of Appeals in Hertz et al. v. Knudson, Deputy and Acting Secretary of Trade and Commerce of Nebraska, 8 Cir., 6 F.2d 812, 816: "* * * owing to the peculiar issues involved, in ruling that the state was not the real party in interest, apparent emphasis has been placed upon the fact that the action did not seek to recover any money for a state." The case at bar is not one of that class of cases.

In State of Missouri v. Homesteaders Life Ass'n, supra, also relied upon by counsel for Dierks, action was brought in the name of the State of Missouri by and through its duly constituted and acting Superintendent of the Insurance Department, to recover a two per cent gross premium tax levied upon the business of foreign insurance companies. The question was raised as to the jurisdiction of the federal court on the ground that the State of Missouri was the real party in interest. The court held that the Superintendent of Insurance was the real party, and not the State. In so doing, it passed upon two questions: [9 F.2d 545] "First, was the Superintendent of Insurance vested with power to maintain an action on behalf of the state; and, second, if he was not, then was this action as brought by him nevertheless an action to which the state was a party?" With respect to the first question, the court concluded as a result of its study of the statutes of Missouri, (1) that the Attorney General was designated as the officer authorized to bring suit in the name of the State (and the Attorney General did not institute the action); (2) that in the instances in which there was an exception to this rule, the statute specifically named what other officer might bring the suit (and no such officer brought the suit); (3)

where suit had been brought in the name of the State by any officer other than the Attorney General, or such officer as the one last referred to, the State did not become a party; and (4) the cause of action there alleged was one which belonged to and must have been brought by the Superintendent of the Insurance Department. And the court concluded that the Superintendent of Insurance was vested with power to maintain the action.

With respect to the second question, the court's decision to the effect that the State of Missouri was not the real party in interest, as stated by Judge Borah while considering this decision in State of Louisiana v. Texas Co., D.C.E.D.La., 38 F.Supp. 860, 862, "was undoubtedly influenced by its finding that under the Missouri laws the superintendent of the insurance department was an entity distinct from the State with power to sue and be sued. The Court found that the Missouri statutes disclaimed responsibility in actions of the character there involved and made the officer, not the State, the active agent. To quote the language of the Court (in the Homesteaders case [State of Missouri v. Homesteaders Life Assn., 8 Cir., 90 F.2d 543, 548]) : 'It is he (the officer) who brings the action. The state pays none of the expenses and disclaims any responsibility for payment of any of the officer's expenses. Any deficiency of income compared to expenses must be made up by assessment by the superintendent upon insurance companies. When the superintendent has succeeded in making collection, "he shall pay the same into the state treasury," and incidentally it is to be observed he is required to give a bond of $100,000, "conditioned for the faithful discharge of his duty." He sues for and recovers in his own name. Any judgment would be paid to him, and it is not until he collects the judgment that he makes payment to the state treasurer. The state is a beneficiary of only one half of the recovery (section 5980, Rev.St. 1929 (Mo.St.Ann. § 5980, p. 4558 [Mo.R. S.A. § 6095])), while the other half goes into a county foreign insurance fund ultimately distributed to the credit of counties and cities (section 5982, Rev.St.1929 (Mo.St. Ann. § 5982, p. 4559 [Mo.R.S.A. § 6097])).'"

The Homesteaders case is distinguishable on the facts. In the instant case the Game and Fish Commission is a Constitutional department of the State government. The Amendment does not create it as a corporate body or authorize it to sue or be sued generally; its commissioners are not required to give bond as in the Homesteaders case; and the State, for the use and benefit of all of its citizens, is the sole beneficiary.

Reagan v. Farmers' Loan & Trust Company, supra, cited by defendant Dierks, was an action brought by the plaintiff as trustee in a deed of trust, executed by a railroad company to secure the payment of certain bonds, against the Attorney General and Railroad Commissioners of Texas, to enjoin the application of certain rates and tariffs fixed by the Commissioners. The Commissioners contended that the State was the real party in interest. In overruling this contention, the court pointed out that the only parties pecuniarily affected were the shippers and the carriers, and said that the State had no pecuniary interest at all in the action. The facts in the Reagan case are not in point here, and the mere fact that the court pointed out in that action that the State's treasury was not affected, does not justify the conclusion urged by Dierks.

The fact that such is not the rule in either the Supreme Court of the United States or in the Eight Circuit is borne out by the decisions in Lankford and others, Composing the State Banking Board of the State of Oklahoma, v. Platte Iron Works Company, 235 U.S. 461, 35 S.Ct. 173, 175, 59 L.Ed. 316, and Hertz et al. v. Knudson, Deputy and Acting Secretary of Trade and Commerce of Nebraska, supra, an Eighth Circuit Court of Appeals case.

In the Lankford case, a suit, by a foreign corporation—a depositor in a bank in Oklahoma—against members of the State Banking Board to compel payments from, distribution of, and assessments for, the "Depositors' Guaranty Fund," was held to be a suit against the state, notwithstanding the fact that the fund in question was the property of the creditors of the bank and not of the state. The Supreme Court said that the state was the real party "because of its

interest that the fund which it has caused to be created in pursuance of its policy shall be administered by the officers it has appointed rather than by judicial tribunals."

In the Hertz case it was held that the State of Nebraska was the real party in interest in an action involving a controversy between federal court receivers appointed in Minnesota of an insolvent Nebraska bonding and surety company and the Nebraska Board of Trade and Commerce, which under the Nebraska law was given the power and authority to administer the affairs of such insolvent corporation, notwithstanding the fact that neither the State's property nor its treasury was affected in a pecuniary sense. In this case under the Nebraska statute the Board of Trade and Commerce was vested by operation of law with title to all of the property of the bonding company as of the date of the order of liquidation. The court cited Lankford et al. v. Platte Iron Works Company, supra, and in drawing an analogy between that decision and the case before the court, said:

"The controlling fact is that in each case there was a fund which was taken over by the state, through a department, for the same essential purpose of providing ultimate payment to all legitimate claimants. To effect this result, the state has made itself an active agent. It has taken over the title thereto, and has asumed all responsibilities concerning it. The suit of the appellee, if sustained, will add to this fund. The defense of appellants, if indulged, would deplete that fund."

All of this, however, is not to say that neither the State's property nor its treasury will be directly affected in a pecuniary sense in the instant case. The funds to be used in payment for the lands condemned are State funds, and the lands when acquired will be public property held by the State for the use and benefit of all its citizens.

Having decided that the State is the real party here, it becomes unnecessary to pass upon the second question, briefed by counsel for Wrape and Magnolia.

The case in its entirety should be remanded to the Circuit Court of Faulkner County, Arkansas.