THE PEOPLE OF THE STATE OF ILLINOIS

*v.*

JAMES M. BRIDGES.

*Filed at Springfield May 11, 1892.*

1. RIGHT OF FISHERY—*private owners—feræ naturæ.* Fish in streams or bodies of water are classed in the common law as *feræ naturæ*, in which the riparian proprietor or owner of the soil covered by the water, even though he may have the sole and exclusive right of fishing in such water, has at best but a qualified property in the fish, which can be rendered absolute only by their actual capture, and which is wholly divested the moment the fish escape to other waters. This rule applies to ponds which are connected with streams only at times of high water.

2. SAME—*legislative control.* Laws regulating the exercise of fishery rights stand upon substantially the same footing with ordinary game laws. The rule will not be questioned that a general statute regulating the killing of game, or restricting the right to kill it to certain portions of the year, applies as well to the game which a particular land owner may chance to find on his own premises, as to that which may be found on the land of others, or upon lands belonging to the public. The same considerations of public policy prevail in the one case as in the other.

3.  Private persons having no absolute and unqualified right to hunt or kill game or to catch fish, but only a boon or privilege granted by the sovereign power of the State, either expressly or impliedly, it follows that nothing is taken from them when denied the privilege, at stated seasons, of capturing or killing game or fish. In any view, the question of individual enjoyment is one of public policy and not of private right.

4.  The power of the legislature to pass laws for the protection and preservation of fish in the waters of the State has been so frequently exercised in this and other States, and such exercise has been so long and uniformly acquiesced in, that the existence of the power is scarcely open to question; and the fact that a particular person has the sole and exclusive fishery right will not exclude this legislative power to control and regulate the exercise of such right.

5.  SAME—*the act restricting fishery rights.* Where a statute prohibits the catching of any fish with any seine, etc., "in or upon any of the rivers, creeks, streams, ponds, lakes, sloughs, bayous and other water-courses wholly within this State or running through the State of Illinois," the word "water-courses" will not be construed as restricting anything previously mentioned, but, on the contrary, it will be held to have been used for the purpose of including any other water-course of the same general nature of those specified, if such there should happen to be in the State, which are not sufficiently described in the specifications already made.

6.  The act for the preservation and protection of fish embraces in its provisions ponds owned by private persons in which the public have no rights, and which the owner may have the power to fill up, if he chooses, although such ponds, in times of high water, connect with some water-course, so that at such times fish may pass in or out of the same.

7.  Section 6 of the amendatory act of 1889, relating to the protection, etc., of fish, is broad enough to include a pond or lake about a quarter of a mile long and from twenty-five to one hundred yards wide, in the bottom near a fork of a river, with which it connects in high water several times in the year.

8.  CONSTRUCTION OF STATUTES — *general rules.* A statute should, if possible, be so construed as to sustain its provisions, by avoiding, when that can be done, all conflict with the fundamental law.

9.  Where several words susceptible of an analogous meaning are coupled together in a statute, the maxim *noscuntur a sociis* is often applied,—that is to say, they take, so to speak, color from each other; but that is usually, if not uniformly, by way of restricting the more general to a sense analogous to the less general.

10. The rule, however, does not seem to have the converse operation. Thus, when various specific terms are associated with words of a more general character, and the ordinary signification of the same is more restrictive than that of all the specific terms taken collectively, the meaning of the general words may be enlarged, but the scope of the specific words will not be restricted, or their force practically nullified, by their association with general words of that character.

11. WATER-COURSE—*what constitutes.* To constitute a water-course, according to the ordinary signification of that term, there must be a stream usually flowing in a particular direction and in a definite channel, and it must usually discharge itself into some other stream or body of water. A water-course does not include ponds and lakes, and perhaps not sloughs and bayous.

APPEAL from the Appellate Court for the Third District;—heard in that court on appeal from the Circuit Court of Sangamon county; the Hon. JAMES A. CREIGHTON, Judge, presiding.

Mr. JOHN C. MATHIS, and Mr. E. S. SMITH, for the People:

The legislature has the power to prohibit the killing of fish in natural, private, as well as public waters. *Commonwealth* v. *Look,* 108 Mass. 456; *Commonwealth* v. *Vincent,* id. 447; *Vinton* v. *Welsh,* 9 Pick. 87; Angell on Water-courses, (7th ed.) 71, and notes; *State* v. *Blount,* 85 Mo. 543; *Parker* v. *People,* 111 Ill. 581.

The language of the title to the act of 1887 shows that the legislature clearly intended to prohibit the seining of fish in all the waters of this State. The intent of the legislature to protect fishes in such bodies of water as Sand Prairie Lake or pond can not be doubted from the language of the title of the act, and in section 6 of the act of 1889 the specific words "pond," "lake" and "slough" are used.

It is a well settled doctrine in the construction of statutes, that when a general description is used, following a specific enumeration of objects or things, it adds something to the specific words, and does not reflect back and limit their meaning. *In re Swigert,* 119 Ill. 83; Endlich on Interpretation of Statutes, secs. 405-407; *Kelley* v. *People,* 132 Ill. 363.

A man has but a transient property in game animals or fish so long as they continue within his premises, and this is not taken away by the statute, but the right to catch and kill is regulated. *State* v. *Blount*, 85 Mo. 543; 2 Blackstone's Com. 394.

Messrs. PALMER & SHUTT, for the appellee:

The right of the State to regulate the time and manner of catching or killing fish in the waters of the State is fully discussed in *Parker* v. *People*, 111 Ill. 581, in Judge Dickey's dissenting opinion.

The descriptive words used in the statute, "rivers, creeks, streams, ponds, lakes, sloughs and bayous," whatever may be their meaning when used alone, are controlled by the more comprehensive words "or other water-courses." The object of the statute, by the use of the words quoted, is made plain, which is, "to encourage the propagation and cultivation, and to secure the protection, of fishes in all the waters of this State," according to the title of the act of 1887.

We have already said that the words "other water-courses," used in the act, limit the meaning of all the preceding connected words. We do not cite authorities to support this proposition, for its correctness can not be disputed without a disregard of all the well known rules of construction. The inhibition of the statute extends to all the water-courses of the State, and no further.

A water-course is well defined by lexicographers to be a stream of water, and a court of high authority says: "To constitute a water-course there must be a stream usually flowing in a particular direction in a definite channel, having a bed, sides or banks, though it may not flow continually, and must usually discharge itself into some other stream or body of water." "For a water-course there must be a channel, a bed to the stream, and not merely low land or a slough over which the water flows." *Palmer* v. *Wadsworth*, 22 Kan. 352.

Mr. Justice Bailey delivered the opinion of the Court:

This was a prosecution, commenced in the name of the People of the State of Illinois, against James M. Bridges, before a justice of the peace of Sangamon county, for a violation of the provisions of the act entitled, "An Act to encourage the propagation and cultivation and to secure the protection of fishes in all the waters of this State," approved May 11, 1887, as amended by an act approved June 3, 1889. Laws of 1887, p. 189; Laws of 1889, p. 158. The trial before the justice of the peace resulted in a judgment in favor of the defendant. The cause was thereupon removed to the Circuit Court by appeal, where a trial *de novo* was had, resulting in the conviction of the defendant, and the imposition upon him of a fine of $10. From that judgment the defendant appealed to the Appellate Court of the Third District, where said conviction was reversed, and a final judgment rendered in favor of the defendant. The present appeal is from said judgment of reversal, the judges of the Appellate Court having granted a certificate that the case involves questions of law of such importance, on account of principal and collateral interests, that it should be passed upon by this court.

The trial in the Circuit Court was without a jury, the facts being all admitted by the following stipulation:

"Jacob Miller is the owner of the south-west quarter of section 8, in township 15, north, range 3, west of the 3d P. M., in Sangamon county, Illinois, in which what is known as Sand Prairie Lake is situate. The small body of water known as Sand Prairie Lake is about one quarter of a mile in length, and its width ranges from about twenty-five to one hundred yards. It is situate in the bottom of the North Fork of the Sangamon River, and is distant from said river only a few yards at the farthest point. There is a low place or depression in said north-west quarter of said section 8, reaching from the north end of said lake or pond to the bed of said

river at most seasons of the year, but in case of high water, this depression or slough fills with water, and connects directly the waters of this pond or lake with the waters of said stream or river, and at times this connection lasts for a period of several days or weeks.

"The rises of said river or stream generally occur in the spring of the year or the early summer, and again in the fall. When there is no high water in the river or stream, the said lake or pond is entirely shut in, and its waters do not mingle at all with the waters of said stream.

"In July, 1889, the defendant, James Bridges, obtained the consent of said Jacob Miller to fish with a seine in said body of water so situate on said premises, and to catch and kill fish in said pond with a seine. After consent was given defendant by Jacob Miller so to do, the defendant, with the help of others, went in and upon said pond, and with a large seine, with meshes of one and one-half inches, and about seventy yards long, (not a minnow seine), dragged said pond or body of water and caught and killed thereby a large number of fish of different kinds, of the varieties common to the waters within the State of Illinois. The North Fork of the Sangamon River is not a stream or river used for navigation."

The foregoing being all the evidence offered at the trial, the Circuit Court held, as matter of law, in substance, that the catching and killing of said fish by the defendant, in manner and form as shown by said stipulation, was unlawful, and rendered the defendant guilty of the offense charged in the complaint.

The statutory provisions for the violation of which the prosecution was instituted, are to be found in the sixth section of said amendatory act, and are as follows:

"That it shall be unlawful for any person to catch or kill any fish with any seine, or other device used as a seine, in or upon any of the rivers, creeks, streams, ponds, lakes, sloughs, bayous or other water-courses wholly within or run-

ning through the State of Illinois; nor shall the meshes of any weir, basket or trap, or any device for catching fish in such waters not above prohibited, except for catching minnows for bait, be less than two inches square: Provided, however, that seining shall be lawful and allowed between the first day of July in each year and the first day of April in the following year, with seines, the meshes of which shall not be less than two inches square, in such rivers or streams as are used for navigation wholly within the State, and not above or beyond any private or corporate dam on said rivers or streams, and also in the navigable bays or lakes connected with such navigable streams wholly within the State, and not extending beyond the overflowed bottoms of such rivers or streams; * * * and any person offending shall be deemed guilty of a misdemeanor and fined as provided in this act."

The questions presented are, 1, whether this statute applies to the lake or pond in controversy, and, 2, whether, as applied to said lake or pond, it is valid. The first of these questions is solely one of construction, and has no dependence upon the second, except so far as it involves the rule that a statute should, if possible, be so construed as to sustain its provisions, by avoiding, where that can be done, all conflict with the fundamental law. Do the provisions of said statute apply, and were they intended by the Legislature to apply, to bodies of water of the character of the one in question here? The object of the statute, as expressed in its title, is, "to encourage the propagation and cultivation and to secure protection of fish in all the waters of this State," and section 6 of the amendatory act prohibits the catching or killing of fish with any seine, etc., "in or upon any of the rivers, creeks, streams, ponds, lakes, sloughs, bayous and other water-courses wholly within this State or running through the State of Illinois." The body of water in question, as the stipulation admits, is a lake or pond of considerable dimensions, lying wholly within this State, and one which, in its natural state, is stocked

with a considerable amount of fish of the varieties common to the waters of this State. The language of the statute is certainly broad enough to include it, and we are unable to yield our assent to the reasons which are urged in favor of the construction which would exclude it.

It is contended that the general words, "other water-courses," should be held to operate as a limitation upon the scope or meaning to be given to the more specific enumeration of different classes of streams or bodies of water, so as to exclude all waters which do not properly fall under the designation of water-courses. It is true that where several words susceptible of an analogous meaning are coupled together, the maxim *noscuntur a sociis* is often applied, that is to say, they take, so to speak, color from each other, but that is usually, if not uniformly, by way of restricting the more general to a sense analogous to the less general. *In re Swigert*, 119 Ill. 83; Endlich on Interpretation of Statutes, secs. 400-411. The rule, however, does not seem to have the converse operation. Thus, where various specific terms are associated with words of a more general character, and the ordinary signification of the general words is more restricted than that of all the specific terms taken collectively, the meaning of the general words may be enlarged, but the scope of the specific words used will not be restricted, or their force practically nullified, by their association with general words of that character.

To constitute a water-course, according to the ordinary signification of that term, there must be a stream usually flowing in a particular direction, and in a definite channel, and it must usually discharge itself into some other stream or body of water. *Palmer* v. *Waddell*, 22 Kansas, 352; *Robinson* v. *Shank*, 20 N. E. R. 713. If then the words "other water-courses" should be given their ordinary signification, and should be allowed to control the more specific words of the statute, they would practically eliminate from it the words "ponds" and "lakes," and perhaps also the words "sloughs"

and "bayous," as the first two of these words, most usually, and the last two very frequently, are not included within the ordinary meaning of "water-courses." It is manifest that this latter term was used, not by way of restricting anything which had already been mentioned, but for the purpose of including any other water-course of the same general nature as those specified, if such there should happen to be in the State, which were not sufficiently described in the specifications already made. Whether or not there were such in fact is not material. The general words were obviously used by way of precaution, so as to render it certain that no waters of that general nature should be omitted.

Again, it is contended that the body of water in question can not be deemed to have been within the contemplation of the Legislature when it passed said statute, because the land covered by said water, as well as all the lands by which it was surrounded, are the private property of Miller, and that said body of water, by reason of its situation, is subject to no right of navigation in favor of the public, and no right of easement in favor of other riparian proprietors. It has no outlet, and during the greater portion of the year, it is cut off from and has no communication with the water-course near which it is situated. It is said that Miller's rights in said body of water are so paramount and exclusive, that if he chose to fill it up and thereby destroy it as a lake or pond, no rights of any private party or of the public would be infringed. And this is put forward as the test of the legislative intention to include said lake among the waters enumerated by said act.

It seems to us to be a sufficient answer to this contention, that the statute itself, neither expressly nor by implication, has established any such test. There may be and doubtless are various, and perhaps many lakes, ponds, sloughs and bayous in the State, which are so far private property, that the owner may drain them or fill them up, without infringing any public or private right, but which, so long as they are

permitted to remain in their natural condition, are places where fish common to the waters of the State are propagated and raised. And while this is so, the statute makes no distinction between bodies of water thus situated and those in respect to which public rights or private easements exist. Its language applies to all alike. Nor would there seem to be any reason why the legislative policy in relation to the protection and preservation of fish in rivers and streams should not apply to waters of this character, especially where they have such connections, either permanent or during occasional periods of high water, with streams or other bodies of water in which fish abound, to draw therefrom their stock of fish. Indeed, the power to protect and preserve the fish in the waters of the State would be practically nugatory, if, as is contended, it was confined to streams and water-courses, and was excluded in case of all bodies of water which were so far subject to private ownership, that the owners would have a right to drain them or fill them up, and thus destroy them as bodies of water. It is well known that lakes, ponds, sloughs and bayous, many if not most of which are thus subject to private ownership, are the very places which are most sought by the various species of migratory fish for the purpose of depositing their spawn, and which are therefore of the highest importance in the propagation and multiplication of those varieties of fish. If the power of the Legislature to make provision for the protection and preservation of fish depended upon the existence of some other public right, like that of navigation, or of some private easement, such as usually belong to riparian proprietors, a different conclusion might follow. But we do not understand that to be the case. The power, where it exists, rests upon other grounds. It is because of the great importance of fish as an article of human food, that their protection and preservation has been regarded as a matter of public concern, and it is upon that ground that Legislatures have assumed the right to interpose their authority by way of preventing any

undue or improper hindrance in the way of their natural in-
crease, and of prohibiting the use of improper means for their
extirpation.

It being clear, as we think, that the statute is broad enough
to include the pond or lake in question, and that bodies of
water of that character are within the legislative intent, the
inquiry involving the greatest difficulty is, whether, as applied
to such bodies of water, the statute is obnoxious to any con-
stitutional objection.   The only objection of that character
which seems to be suggested is, that it is an undue and un-
warrantable interference with the property rights of the owner
of the land upon which said pond or lake is situate.

Fish, in streams or bodies of water, have always been classed
by the common law as *feræ naturæ*, in which the riparian pro-
prietor or the owner of the soil covered by the water, even
though he may have the sole and exclusive right of fishing in
such waters, has at best but a qualified property, which can
be rendered absolute only by their actual capture, and which
is wholly divested the moment the fish escape to other waters.
We are unable to see that there is anything in the situation
or character of the pond or lake in question which takes it
out of the rule.   While said body of water has no continuous
connection with the river situated but a few yards away, such
connection is established during all periods of high water, and
continues for a sufficient length of time to allow fish to pass
into it, or the fish in the lake to escape therefrom.   During
such periods of high water, which occur once or twice, if not
oftener every year, and continue sometimes for several weeks,
said lake, so far as the passage of fish to and from it is con-
cerned, becomes, for all practical purposes, a part of the river.
During these periods, as we may presume, migratory fish,
passing up the river in search of proper places for depositing
their spawn, are liable, for such purpose, to pass into this, as
into other bayous where the waters are quiet, but with this
difference, that while in case of ordinary bayous, which main-

tain their connection with the stream, the fish, after accomplishing their purpose, are at liberty to leave and go elsewhere, here, by the receding of the water, their exit is for the time being cut off, and they as well their progeny are compelled to remain. As soon, however, as another flood occurs—a thing which may happen at any season of the year—the fish thus impounded are at liberty to escape, and if they do so, any qualified property the owner of the lake may have in them is at once divested.

We are unable to see how the mere fact that said lake, instead of having a continual connection with the river, has such connection only during periods of high water, can have any essential bearing upon the rights which the owner of the soil has in the fish that happen for the time being to be in the lake. It undoubtedly greatly increases his opportunities for obtaining an absolute title by catching and reducing them to possession, but until he does so, he has only the same and no better title to them than he would have if the lake were merely a bayou having uninterrupted connection with the river. It is impossible therefore to distinguish the present case from those arising in relation to other waters in the State to which the statute is applicable. The public interest is involved in both in the same way if not to the same extent, and the public interest in both is such as to justify legislative interposition.

The power of the Legislature to pass laws for the protection and preservation of fish in the waters of the State has been so frequently exercised in this and other States, and such exercise has been so long and so uniformly acquiesced in, that the existence of the power, at the present day, is scarcely open to question. Thus, in *Weller* v. *Snover*, 42 N. J. L. 341, the court reviews various authorities bearing upon the question and says: "The great interest of the general government, and of the government of our State, in protecting fisheries, in stocking them with fish, in guarding them as a supply of food for our people, and in fostering and raising game fish, has been

manifested by frequent legislation and appropriations for these purposes. The right of the State thus to legislate can not be disputed." See also *Doughty* v. *Conover,* 42 N. J. L. 193. In *People* v. *Reed,* 47 Barb. 235, which was an indictment for taking fish with a net in violation of a statute prohibiting the taking of fish in that manner within the waters of the State, the court say : "There is no force in the objection to the power of the Legislature to pass a valid law to prevent taking fish, at certain seasons, within the waters of this State. It is a power which the Legislature has always exercised, and the right is founded in considerations of public policy."

In *Gentile* v. *The State,* 29 Ind. 409, which was a criminal prosecution for a violation of a statute prohibiting the trapping, netting or seining of fish, it is said : "We find nothing in the Constitution restricting the powers of the Legislature over the subject, and therefore hold the statute constitutional." In *Drew* v. *Hillaker,* 56 Vt. 641, a similar statute was held constitutional. Legislation of this character is directly or incidentally sustained in the following decisions : *State* v. *Roberts,* 59 N. H. 256 ; *State* v. *Roberts,* id. 484 ; *State* v. *Beal,* 75 Me. 289 ; *State* v. *Blount,* 85 Mo. 543 ; *Maney* v. *The State,* 6 Lea, (Tenn.) 218 ; *Commonwealth* v. *Look,* 108 Mass. 452 ; *Commonwealth* v. *Richardson,* 142 id. 71 ; *Holyoke Co.* v. *Lyman,* 15 Wall. 500 ; *State* v. *Franklin Falls Co.* 49 N. H. 240 ; *State* v. *Boone,* 30 Ind. 225 ; *Vinton* v. *Welsh,* 9 Pick. 87 ; *State* v. *Hockett,* 29 Ind. 302. These are but a few of the numerous cases to be found in the reports bearing on the subject, but as the general power of the Legislature to pass laws for the protection of fish and the regulation of fisheries does not seem to be questioned, further reference to the decisions of other States is unnecessary.

In none of these cases, so far as we have been able to examine them, has the fact that a particular individual has the sole and exclusive fishery right, been held to exclude the legislative power to control and regulate the exercise of such right.

In *Beckman* v. *Kreamer*, 43 Ill. 447, such exclusive fishery right is defined and limited as follows: "By the common law, a right to take fish belongs so essentially to the right to the soil in streams or bodies of water, where the tide does not ebb and flow, that if the riparian proprietor owns upon both sides of such stream, no one but himself may come upon the limits of his land and take fish there; and the same rule applies so far as his land extends, to-wit, to the thread of the stream, where he owns upon one side only. Within these limits, by the common law, his right of fishery is sole and exclusive, unless restricted by some local law or well established usage of the State where the premises may be situate." It may be observed that, under this definition, the fishery right of the land owner in the case before us, is no more exclusive than is that of a riparian proprietor on one or both sides of a stream above tide water, and both are equally subject to such rules as may be imposed by law or usage upon its exercise.

Laws regulating the exercise of fishery rights stand, so far as the questions now under consideration are concerned, upon substantially the same footing with ordinary game laws, and we think the rule will not be questioned that a general statute regulating the killing of game, or restricting the right to kill it to certain portions of the year, apply as well to the game which a particular land-owner may chance to find on his own premises, as to that which may be found on the land of others, or upon lands belonging to the public. Precisely the same considerations of public policy prevail in one case as in the other. The object of laws restricting the killing of certain game birds to particular seasons of the year, is, to favor their increase and prevent their undue extinction, and that object may be quite as successfully thwarted by each proprietor killing them on his own premises, as by hunting and killing them on the lands of others.

In *Magner* v. *The People*, 97 Ill. 320, this court, in affirming the validity of certain laws restricting the killing of game,

said: "No one has a property in the animals and fowls de-nominated game, until they are reduced to possession. Whilst they are untamed and at large, the ownership is said to be in the sovereign authority—in Great Britian in the king—but with us in the people of the State. The policy of the common law was to regulate and control the hunting and killing of game, for its better preservation; and such regulation and control, according to Blackstone, belong to the police power of the government. * * * The ownership being in the people of the State—the repository of the sovereign authority —and no individual having any property rights to be affected, it necessarily results that the Legislature, as the representative of the people of the State, may withhold or grant to individuals the right to hunt or kill game, or qualify or restrict it, as, in the opinion of its members, will best subserve the public welfare. Stated in other language, to hunt and kill game is a boon or privilege granted, either expressly or impliedly, by the sovereign authority, not a right inhering in the individual; and consequently, nothing is taken away from the individual when he is denied the privilege, at stated seasons, of hunting and killing game. It is, perhaps, accurate to say that the ownership of the sovereign authority is in trust for all the people of the State, and hence, by implication, it is the duty of the Legislature to enact such laws as will best preserve the subject of the trust, and secure its beneficial use, in the future, to the people of the State. But in any view, the question of individual enjoyment is one of public policy, and not of private right."

What is here quoted applies with equal appropriateness to laws having for their object the preservation of fish in the waters of the State, and such application is made in said opinion, by way of argument, in the following language: "So far as we are aware, it has never been judicially denied that the government, under its police powers, may make regulations for the preservation of game and fish, restricting their

taking and molestation to certain seasons of the year, although laws to this effect, it is believed, have been in force in many of the older States, since the organization of the Federal government. On the contrary, the constitutional right to enact such laws has been expressly affirmed, in regard to fish;" (citing several of the cases to which reference has already been made, in which the constitutionality of such acts is affirmed,) and adding: "Upon principle, the right is clear."

Testing the case then in the light of both reason and authority, we are of the opinion that the statute under consideration was intended to and does apply to the lake or pond in question, and as so applied, it is constitutional and valid. In reaching a contrary conclusion, the Appellate Court erred, and its judgment will therefore be reversed and the judgment of the Circuit Court will be affirmed.

*Judgment reversed.*