(Nos. 4238, 4392, 4399 and 4486—Consolidated—)

Kenneth L. Martin, Et Al, A. A. Seibert, Et Al, Gerald Miller, Et Al, and Henry A. Shumaker, Claimants, *vs.* State of Illinois, Respondent.

*Opinion filed February 24, 1960.*

*Petition of Claimants for Rehearing denied November 16, 1960.*

LANSDEN AND LANSDEN, PEYTON BERBLING, and J. KELLY SMITH, Attorneys for Claimants.

LATHAM CASTLE, Attorney General; C. ARTHUR NEBEL, Assistant Attorney General, for Respondent.

TOLSON, C. J.

The claims of certain landowners, tenants, or both, for the recovery of damages occasioned by the alleged neglect of the State of Illinois in its operation of a game preserve, known as Horseshoe Lake, in Alexander County, Illinois, are involved in these consolidated cases.

The complaints, as amended, charge the State in the following terms:

That the State of Illinois, through its Department of Conservation, owns and operates Horseshoe Lake Game Preserve.

That respondent, by virtue of Chap. 61, Sec. 154, Ill. Rev. Stats., has ownership and title to all wild birds.

That respondent, in the operation of the preserve, and in conjunction with agents of the United States of America, has encouraged the concentration of migratory water fowl in the surrounding area.

That claimants were free from contributory negligence, and exercised due care for the safety of their property and crops.

That claimants, naming them individually, were tenants, owners, or both, on lands surrounding the preserve, and during the years of 1947 and 1948 raised substantial amounts of corn, beans, and other crops.

That commencing on November 1, 1947, and continuing to the date of these suits, substantial quantities of corn, beans, and other crops were destroyed by wild geese.

That respondent, through its agents:

(a) Was negligent in failing to protect plaintiff's crops.

(b) Created a nuisance, which caused loss of crops.

(c) Knew of the predatory nature of wild geese, and did nothing about it.

(d) Is an insurer of plaintiffs' crops from the action of the geese.

(e) By non-action cannot avoid liability.

(f) In 1947 and 1948, by the use of bombs, stirred up the geese, and caused them to enter the fields of claimants.

(g) By permitting geese to damage crops has interfered with the exclusive occupation and enjoyment of plaintiffs' lands.

(h) Has title to the geese, and is responsible for any depredation.

(i) By permitting geese to congregate in vast numbers, and knowing their dangerous propensities, has negligently caused damages.

(j) By negligently concentrating the geese at Horseshoe Lake, and thereafter failing to feed them, has failed to perform the duty owed plaintiffs.

(k) As an owner of wild geese, owed the duty of protecting innocent individuals from damages.

(l) Trapped, and thereafter liberated geese, which came upon the lands of claimants after October 31, 1947, and damaged crops.

(m) On October 1, 1947, knew:

The habits of the geese to concentrate between September and April on Horseshoe Lake, with the heaviest concentration in October through December.

The population of the flock was approximately 30,000, which thereafter did not decrease.

Few fowl passed over Alexander County without settling on the preserve.

Horseshoe Lake was too small for feeding and resting that number of birds.

The fowl flew directly from Horseshoe Lake to the lands of the claimants.

The number of fowl on claimants' lands ranged from a few to 25,000.

That the migratory water fowl creating the damages, as alleged, came from Horseshoe Lake.

That one or all of the acts alleged occurred within two years prior to the filing of the complaints.

That respondent was negligent in failing to raise or provide sufficient food to feed the geese, and in its operation of the Horseshoe Lake Game Preserve.

That respondent's action or non-action was the proximate cause of injuries.

The complaints then conclude with a prayer for relief as to the several claimants for losses occurring in the seasons of 1947-1948 and 1948-1949.

These cases have been in Court for several years. The transcript of evidence is more than 800 pages in length, and considerable time was taken by the parties to make corrections therein. The facts involved are both novel and unusual, and the parties, by their pleadings, have presented difficult questions of law and construction of statutes.

As a background to the problem, it is to be noted that, as far back as history records, certain birds found on the Continent of North America have migrated each year from Canada to Central America. From a map introduced in evidence, it appears that there are four flight patterns across the United States, which are literally highways for migratory birds, and of equal interest is the fact that, once a pattern is established, each succeeding generation of birds will follow his ancestral course to the exclusion of all others.

We are primarily concerned with the Mississippi Flyway, as Horseshoe Lake is a feeding and resting area directly in its path. In the early history of the United States, countless thousands of geese and ducks were to be found in this area, and it seemed as though the supply was inexhaustible. However, with an increase in the number of hunters and improved firearms, it was soon demonstrated that Canadian geese would become extinct unless regulations were established for their protection.

Since uniformity of regulations involved not only the United States, but also our neighbors, Canada and Mexico, the situation was resolved by way of treaty. On December 8, 1916, a treaty between the United States and Great Britain was proclaimed, which treaty was, on February 17, 1936, entered into by the United Mexican States. It recited that many species of birds (not limited to ducks and geese) in their annual migration were in danger of extermination for lack of adequate protection.

The act provided for closed seasons and other forms of protection, and directed each country to provide the necessary measures, by legislative action, to carry out the terms of the treaty. Congress thereafter enacted the Migratory Bird Treaty Act of June 3, 1918. This law prohibited the taking, killing or possession of migratory birds, except as permitted by regulation, and provided severe penalties for violation. The Secretary of Interior was directed to implement the act by regulations, which would become effective when approved by the President.

Since the treaty is of great significance in these cases, it is important to consider the rule established in the case of *Missouri* vs. *Holland,* 252 U.S. 416. The State of Missouri challenged the constitutionality of the Migratory Bird Treaty Act of 1918 by seeking an injunction against a federal game warden from enforcing the act. The State contended that under the Tenth Amendment "Powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States, respectively, or to its people." The State of Missouri took the position that it had the exclusive right to legislate concerning water fowl within its territorial limits, and, therefore, federal legislation was unconstitutional.

Justice Holmes, in his opinion, pointed out that under Art. II, Sec. 2, of the Constitution, the power to make treaties is expressly delegated to the President, by and with the consent of the Senate; and, further, under Art. VI such treaties, together with the Constitution and laws of the United States made in pursuance thereof, are declared to be the supreme law of the land. He concluded by stating that, if the treaty of 1916 is valid, there can be no dispute about the validity of the Migra-

tory Bird Act of 1918, as a necessary means to execute the powers of government.

The opinion also stated that there is no doubt but what a State may regulate the killing of birds by its own inhabitants, but it does not follow that its authority is exclusive or paramount. Valid treaties are binding upon a State. The subject matter (birds) is only transitory within a State, and has no permanent habitat therein. But for the treaty, there soon might have been no birds for any power to deal with. (Decree affirmed.)

With this understanding of the national and international policy of protecting migratory birds, we will now consider the activity of the State of Illinois in this regard.

Alexander County is bounded on the west by the Mississippi River. To the east thereof prior to 1928 was an area of lowlands and sloughs, which overflowed in the spring due to its proximity to the river and island. It was a natural habitat for ducks and geese for many years.

In 1928, the State of Illinois purchased about 3,100 acres in this area, and built a dam to impound water and create an artificial lake, now known as Horseshoe Lake. An irregular area in the form of a horseshoe created an island containing approximately 1,100 acres, and the whole area was then designated as Horseshoe Lake Game Preserve.

The island was cultivated by the Department of Conservation for food for the geese, which assembled there, and over the years the preserve became a haven for the feeding and resting of game birds. As one witness testified, Horseshoe Lake Game Preserve had the largest concentration of wild Canadian geese in the world. As respondent has most strongly pointed out, this was an economic blessing to the farmers and property owners

in a surrounding area of five or more miles, as gun clubs and hunting rental zones were established to provide shooting facilities. Farmers and landowners thus had a second money crop, and were not limited to the usual hazards of farming in the area. It became such a success as a hunter's paradise that the Canadian geese were threatened with extinction.

On October 1, 1947, the President of the United States signed proclamation No. 2748, which prohibited the hunting of all wild geese in a designated area surrounding Horseshoe Lake Game Preserve, which included the lands of all claimants, as well as many others. At or about the same time the Governor of the State of Illinois joined in a supporting proclamation. As a matter of fact, this was a needless gesture, as the President's proclamation alone would have stopped all hunting. (*Missouri* vs. *Holland.*)

This was a tremendous economic blow to the landowners, as it shut off all revenue from the use of their hunting facilities; and, at the same time, it generated a new problem, which is the subject matter of these claims.

It took just a short time for the remaining geese to discover that they could forage for miles with complete immunity. The food supply, provided by the State Department of Conservation, was soon exhausted. As one witness testified, the State had food for about sixteen days. Thereafter the geese moved in on the lands of claimants, much like a swarm of locusts, and completely destroyed their crops.

One might assume at this point, that owners and tenant farmers would have an inherent right to use such force, i.e., guns, etc., to drive away or kill, if necessary, any geese damaging their crops. As a matter of fact, the proclamation of October 1, 1947 flatly prohibited the killing of geese under penalty of law. Agents from the

Department of Conservation and owners of the land made futile attempts to keep the geese moving by aerial bombs and other artificial devices, but the record is clear that all such attempts ended in failure, and the geese proceeded to strip the farms of their crops.

Some of the claimants, acting under the belief that their losses were occasioned by the Presidential proclamation, filed suits in the federal courts for relief. Two of the cases appear to express the attitude of the Federal Government in the matter, and are set forth briefly.

In *Lansden, Et Al* vs. *Hart,* 168 F. (2d) 409, plaintiffs, as landowners, owners of lease holds, and operators of hunting clubs, brought action to enjoin Federal and State officials from enforcing the proclamation of the President and Governor. The complaints stated that on October 1, 1947, the President of the United States, pursuant to the provisions of the Migratory Bird Treaty Act, signed a proclamation prohibiting the hunting of all wild geese in an area of 20,000 acres surrounding Horseshoe Lake. The Governor of Illinois signed a similar proclamation. Plaintiffs alleged irreparable damages. They urged that such actions were arbitrary and capricious, and that the Governor's proclamation violated the Federal and State Constitutions.

At the hearing before the district court for a preliminary injunction, the court found that numerous hearings had been held by the Department of Interior regarding the increase and decrease of the flocks, that certain plaintiffs had attended such hearings, and petitions had been filed by the attorneys for said plaintiffs. The district judge denied the motion for an injunction.

On appeal, the Circuit Court of Appeals pointed out that the Migratory Bird Treaty Act provided that, unless permitted by regulations, it was unlawful to hunt and kill migratory birds; that proclamation No. 2748 was

a proper exercise of the administrative discretion vested in the Secretary of Interior and the President; that in order to carry out the treaty, the Secretary was authorized to determine when and to what extent, *if at all,* hunting would be allowed, and to adopt suitable regulations; that both proclamations were neither unreasonable nor capricious, but were justified by the facts; that the Governor's proclamation does not violate the Federal or State Constitution, and was authorized by Sec. 3 of the Game Code of Illinois; and, that plaintiffs have no property rights in live migratory birds, as permission to hunt, given by Federal and State regulations, is not the grant of a property right, but is the grant of a privilege. A rehearing in this case was denied on June 24, 1948.

In the cases of *Sickman, Et Al* vs. *United States,* and *Ryal* vs. *United States,* 184 Fed. (2d) 616, plaintiffs in three suits, as owners or tenants on farms, brought action under the Federal Tort Claims Act seeking to recover damages in the amount of $26,500.00 for damages to crops destroyed in 1946-1947 by migratory geese. The trial court sustained a motion to dismiss, and plaintiffs elected to stand on the pleadings.

The complaints alleged:

(a) Defendant was negligent in failing to protect plaintiffs' crops.

(b) Defendant created a nuisance by which plaintiffs' crops were destroyed.

(c) Defendant, knowing the predatory nature of geese, failed to protect plaintiffs' crops.

(d) Defendant is an insurer of plaintiffs' crops.

(e) Defendant cannot avoid liability by non-action.

(f) Defendant, by permitting the geese to destroy said crops, interfered with plaintiffs' exclusive enjoyment of their land.

(g) Defendant, by stirring up the geese, caused damages that would not otherwise have happened.

(h) Defendant, by having geese in its possession and control, is responsible for depredation.

(i) By permitting geese to congregate in the preserve, and knowing their dangerous propensities, defendant negligently injured plaintiffs.

(j) By neglecting to concentrate the geese at Horseshoe Lake, or other areas, defendant failed to perform the duty owed plaintiffs.

(k) When geese are in the United States, the United States is the owner and has possession, or is the trustee for the parties to the treaty.

The court discussed the pertinent sections of the Federal Tort Claims Act, which waive immunity of the sovereign. It cited 28 U.S.C.A. Secs. 1346(b) and 2674, which read as follows:

Sec. 1346(b): "Subject to the provisions of Chap. 173 of this title, the district courts * * * shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, * * * for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

Sec. 2674: "The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages."

The court held that the United States, considered as a private person, did not have ownership, control or possession of these wild geese. Further, that a private person could not be held liable for the trespass of an animal, which is firae naturae. On the merits, the court pointed out that it did not believe the complaints stated claims for which relief could be granted.

On the subject of jurisdiction, the court cited Sec. 2680(a) of the Federal Tort Claims Act, which is as follows:

"The provisions of this Chap. and Sec. 1346(b) of this title shall not apply to:

'(a) Any claim based upon an act or omission of an employee of the government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the government, whether or not the discretion involved be abused.' "

The court concluded its opinion stating that it believed the allegations in the complaint fell within the

provisions of the exceptions. It cited the case of *Lansden* vs. *Hart* as to the authority for a discretionary act by the Secretary of Interior. The decree was affirmed.

There are many other federal cases involving this subject matter, and, without exception, they hold that the United States claims paramount authority over the respective States in protecting migratory birds. Of equal importance, the decisions have denied compensation to all claimants, though injuries were quite apparent.

As to the complaints before this Court, on November 29, 1949 respondent filed a motion to strike these amended complaints, which motion was denied on December 15, 1950 by Judge Schuman, a member of this Court at the time. Counsel for claimants contend that all matters raised by said motion have been resolved, and may not further be inquired into by the Court in arriving at its decision.

The multiple complaints, amendments, answers and motions in these cases are voluminous. To add to the complexity, the testimony was heard in part by three Commissioners. This Court heard lengthy oral arguments covering facts and law. To render a decision, it believes it must consider all matters before it, and, therefore, concludes it is not bound by the order of December 15, 1950 in its entirety, but will consider the order, together with all other matters pertaining to the cases.

Attention is directed to Rule 25 of the Court of Claims, which provides for rehearings. Upon an adverse decision, respondent could, by motion, point out matters overlooked or misapprehended, and the original briefs, etc., would stand as the files in the case. The Court of necessity would be obliged to review all matters in order to rule on the motion.

The testimony in these cases clearly establishes that claimants suffered great monetary losses. Respondent

has not disputed seriously the amounts claimed by the various claimants, but contends that the losses were occasioned by proclamation No. 2748, which was signed by the President on October 1, 1947. It prohibited the hunting of wild geese in a designated area surrounding Horseshoe Lake Game Preserve, which included the lands of all claimants, as well as many others.

Respondent further contends that the supporting proclamation, which was signed by the Governor of the State of Illinois, was for all practical purposes an empty gesture, as the Presidential proclamation standing alone, by reason of paramount jurisdiction (*Missouri* vs. *Holland*), would have accomplished the same results.

Respondent finally contends that in any event, according to law, injuries received under these facts are not compensable.

Cases from Illinois and other jurisdictions seem to establish that a State in its sovereign capacity may pass legislation protecting wild life, even though an individual may suffer losses, and, further, that such losses are not compensable.

The leading case in the United States in support of the above rule, and cited in other jurisdictions, is *Barrett* vs. *State,* 220 N.Y. 423. In that case, Barrett, a landowner, had secured an award in the amount of $1,900.00 for trees destroyed by beavers. The record disclosed that the State had purchased twenty-one beavers, and had released them in certain areas near claimant's land. Because of the threat of complete extermination, the State had undertaken to afford the beavers complete protection by having no open seasons.

On appeal, three propositions were submitted: (1) The State may not protect, under its police power, an animal, such as a beaver, which is known to be destruc-

tive; (2) The law of 1904 prohibits claimants from protecting their property, and is, therefore, an unreasonable exercise of police power; (3) The State, having actual possession of the beavers, and thereafter freeing them with knowledge of their natural propensities to destroy trees, is liable in damages.

In rendering a decision, the court held that the State is owner in its sovereign capacity, and that the protection and preservation of game is found in all civilized countries. The court stated that, whenever protection is accorded, harm may be done to an individual, and in certain cases the Legislature may be mistaken, and do more harm than good, but this is within its discretion, and not to be reviewed by it. Further, the court held that police power is not limited to guarding the physical or material interests of its citizens—their moral and intellectual interests must also be considered.

The court pointed out that claimants could have enclosed their lands with fences, or driven the beavers away, as the sole object of the State's action was the protection of the beavers.

As to the possession and liberation of the beavers, the court acknowledged that mistakes have been made. It pointed out that the rabbit in Australia and the mongoose in the West Indies have become pests, yet governments have made these experiments in the belief that the public good would be promoted. Whether a success or failure, such attempts are well within governmental powers.

With reference to liability, the court stated that it was true that one, who keeps a wild animal in captivity, is liable at his peril for damages. It, however, hastened to add that it is not true that, when an individual is liable for a certain act, the State is liable for the same act. In performing governmental functions, as involved in this

case, the court pointed out that the State was acting as a trustee for the people, and was not liable.

The rule in the Barrett case was also followed in *Corron* vs. *State*, 10 N.Y.S. (2d) 960 (destruction of orchards by rabbits); *Anthony* vs. *State*, 122 N.Y.S. (2d) 830 (protection of deer running at large on highways); and, *Geer* vs. *Connecticut*, 161 U.S. 619 (State Game laws alleged to violate Interstate Commerce Law).

Some of the cases, which have been passed upon by our courts in construing the provisions of the Fish and Game Code of the State of Illinois are *Magner* vs. *The People*, 97 Ill. 320 (conviction affirmed for selling quail out of season, though purchased in another State); *Parker* vs. *The People*, 111 Ill. 581 (conviction affirmed for maintaining a dam, which obstructed the passage of fish in the river); *Bridges* vs. *The People*, 142 Ill. 30 (conviction affirmed for seining fish on a private lake); *Diekman* vs. *The People*, 285 Ill. 97 (conviction affirmed for fishing except with hook and line); and, *Walton* vs. *The People*, 314 Ill. 45 (conviction affirmed regardless of defendant's plea that he was a commercial fisherman, and was deprived of his property without due process of law). While they are penal in nature, it is of interest to note the reason for the rule. The court in its opinion in *Bridges* vs. *The People*, 142 Ill. 30, quoted at page 44 the following excerpt from the opinion in *Magner* vs. *The People*, 97 Ill. 320:

"No one has a property in the animals and fowls denominated game, until they are reduced to possession. Whilst they are untamed and at large, the ownership is said to be in the sovereign authority—in Great Britain in the king—but with us in the people of the State. The policy of the common law was to regulate and control the hunting and killing of game, for its better preservation; and such regulation and control, according to Blackstone, belong to the police power of the government. * * * The ownership being in the people of the State—the repository of the sovereign authority—and no individual having any property rights to be affected, it necessarily results that the Legislature, as the representative of the people of the State, may withhold or grant to individuals the right to hunt or kill game, or qualify

or restrict it, as, in the opinion of its members, will best subserve the public welfare. Stated in other language, to hunt and kill game is a boon or privilege granted, either expressly or impliedly, by the sovereign authority, not a right inhering in the individual; and, consequently, nothing is taken away from the individual when he is denied the privilege, at stated seasons, of hunting and killing game. It is, perhaps, accurate to say that the ownership of the sovereign authority is in trust for all the people of the State, and hence, by implication, it is the duty of the Legislature to enact such laws as will best preserve the subject of the trust, and secure its beneficial use, in the future, to the people of the State. But in any view, the question of individual enjoyment is one of public policy, and not of private right."

In arriving at a decision in this case, the Court wishes to acknowledge the outstanding briefs submitted by the parties hereto. There are many cases cited from other jurisdictions, which have been helpful, but have not been set out in this opinion, as they are merely cumulative.

From a review of the facts and the law herein, the Court finds that the damages suffered by the several claimants were occasioned by the Presidential proclamation No. 2748 of October 1, 1947. The fact that the Governor of this State issued a supplemental proclamation is of little consequence, for, from the date of the proclamation, the federal government was in complete authority. It cannot be seriously argued that the State of Illinois should pay damages for the action of a paramount authority, when it is apparent that the State could not have successfully challenged that authority.

In addition thereto, it is established law that a sovereign State, under its police power, may pass regulations for the protection of wildlife, and, since an individual does not have property rights in wildlife, the sovereign is not liable for any consequential damages.

This Court recognizes that claimants have suffered substantial consequential damages, but, under existing law, it is powerless to provide a remedy, as this is a matter for the Legislature.

An award is, therefore, denied.

## Opinion on Rehearing

Per Curiam:

On July 22, 1960, claimants filed their petition for a rehearing, and, as grounds for such, suggest the following:

1. The Court has entirely overlooked the theory of nuisance under which claimants were alternatively proceeding.

2. The Court, while disregarding Judge Schuman's prior opinion, has not, in any way, distinguished it, or demonstrated that such opinion was incorrect or wrong.

3. While it may be correct that the Federal government does not own migratory water fowl, the Game Code of Illinois has always categorically stated that the State of Illinois has title to and owns such birds. Therefore, such State property must be so managed and controlled as not to injure others.

4. Presidential proclamation No. 2748 and the Governor's proclamation are of significance only as to the issue of claimants' contributory negligence. Since such proclamations rendered claimants defenseless against geese depredations, claimants could not be charged with contributory negligence.

5. To now say that the Presidential proclamation No. 2748 was in effect, while the Governor's proclamation was an idle gesture, is to overlook entirely the fact that the actions of the United States and the State of Illinois were coordinated to the day and almost the hour and were joint, and that the validity and efficacy of both proclamations were upheld in *Lansden, Et Al* vs. *Hart*, 168 F. (2d) 409.

6. The Court seems to think that an exercise of a valid police power absolves the State from all liability. However, negligent exercise of such power is the very basis and one of the chief reasons for the creation and existence of the Illinois Court of Claims.

7. The Court apparently feels that a governmental function is involved. Under the present Court of Claims Act and since 1945 this is immaterial.

8. The Court has entirely disregarded the trend in Illinois toward the complete abolition of governmental immunity for wrongs committed against its citizens.

As to the first point, the Court does not agree with claimants that the evidence in this case supports the theory of nuisance. To the contrary, the maintenance of Horseshoe Lake Game Preserve was of economic importance to claimants for a number of years.

As to the second point mentioned above, the Court did not disregard the opinion of Judge Schuman, but considered it with all other evidence introduced in said

case. It is to be noted that respondent filed a motion to dismiss the complaint. The only question before the Court at that time was the legal sufficiency of the complaint. The Court in its opinion used the language "for the purpose of passing on this motion, etc.," the motion is denied. In denying the motion to strike the complaint, the Court did nothing more than rule that the complaint stated a cause of action. Thereafter answers were filed by respondent, replies were filed by claimants, the cases were tried, a whole day was devoted to oral arguments, and elaborate briefs were filed by both parties.

As to the third point mentioned in the petition, the word "owner" has been construed by the Supreme Court of Illinois in the case of *Bridges* vs. *The People,* 142 Ill. 30, to mean that the sovereign authority holds wild life in trust for all the people, rather than physical ownership as such.

As to the fourth point, there is no finding of contributory negligence in this case by the Court so as to bar a recovery by claimants.

As to the fifth point regarding the legal effect of the Presidential proclamation and the Governor's proclamation being issued on the same day, it suffices to say that the ruling in *Missouri* vs. *Holland,* 252 U.S. 416, establishes the paramount authority of the United States to regulate under the Migratory Bird Treaty Act of 1918. Any proclamation of the Governor, issued before or after the date of the Presidential proclamation No. 2748, could not affect the finality of the President's act.

As to the remaining objections, claimants contend that the failure of the State to protect the claimants from the depredations of the geese was an act of negligence, and this Court should recognize the trend toward abolition of governmental immunity. As was pointed out in the opinion, the Court recognized that claimants suffered

losses. However, this Court may no longer make an award on the basis of equity and good conscience, but must hear and determine all claims on the basis of the law as determined by our Courts.

It seems to be well settled law that a State, acting in its sovereign capacity and as a trustee of wild life, may legislate to the detriment of an individual in the protection of wild life, and such detriment is not compensable (*Barrett* vs. *State*, 220 N.Y. 423).

The petition for rehearing is, therefore, denied.